BLAKE G. HALL, ESQ.
SAM L. ANGELL, ESQ.
DILLON S. ERICKSON, ESQ.
HALL ANGELL & ASSOCIATES, LLP
1075 S Utah Avenue, Suite 150
Idaho Falls, Idaho 83402
Telephone (208) 522-3003
Fax (208) 621-3008
*ISB Nos. 2434, 7012 and 10312*
bgh@hasattorneys.com
sla@hasattorneys.com
dse@hasattorneys.com

Attorneys for Defendant City of Burley

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| OTTIS D. PHERIGO, an individual, | Case No. 4:21-cv-364 |
| Plaintiff, | **DECLARATION OF COUNSEL IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| CITY OF BURLEY, an Idaho municipal corporation, | |
| Defendant. | |

I, BLAKE G. HALL hereby swear under penalty of perjury as follows:

1.      I am over eighteen years of age and I make this declaration based upon my own personal knowledge unless otherwise stated.

2.      I am one of the attorneys of record for Defendant City of Burley.

3.      On June 9, 2022, Defendant took the deposition of Plaintiff Ottis Daniel Pherigo on the facts of this matter. Attached hereto as Exhibits A, B, D, and E are true and correct copies of relevant excerpts of Plaintiff's deposition.

4.      On September 12, 2022, Plaintiff took the deposition of Rusty Blackner on the facts of this matter. Attached hereto as Exhibit C is a true and correct copy of relevant excerpts of Mr. Blackner's deposition.

Dated this 9th day of November, 2022.

_____
BLAKE G. HALL

DECLARATION OF COUNSEL IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 1

## CERTIFICATE OF SERVICE

I hereby certify that I served a true copy of the foregoing document upon the following this 9th day of November, 2022, by the method indicated below:

Kelly H. Andersen, Esq.                    [X] CM/ECF
David W. Gadd, Esq.
STOVER GADD & ASSOC.
PO Box 1428
Twin Falls, ID 83303
Email: kha@magicvalleylaw.com
Email: dwg@magicvalleylaw.com


_____
BLAKE G. HALL

DECLARATION OF COUNSEL IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT - 2

# EXHIBIT A

A.   No.  She -- she was sick for almost 12 years.

Q.   And you mentioned that in connection with Lindsey Yeaman.  Did that have some effect on your ability to work with coworkers, or how did that come up?

A.   I just -- I don't know, I just didn't speak with her for about six months.

Q.   After that, give me an idea of what your interactions were like with Lindsey Yeaman.

A.   Professional.  When she had issues with lab equipment or whatever, I'd repair them, make everything good again.

Q.   Was her office in that main building?

A.   Yes.

Q.   How many people were in the office in the main building?

A.   Just everyone that worked there.

Q.   Did you have any involvement with Lindsey becoming the pretreatment coordinator when Jeanie retired?

A.   No.

Q.   What was your involvement relationship -- those are the wrong words.

How well did you know Jeanie when she was the pretreatment coordinator?

A.   Well, a coworker.

# EXHIBIT B

Q.  Did they say anything else that they planned to do?

A.  Mark Mitton wanted her to work on the new permit that she had already wasted three months on for not having the right documentation, and she agreed to do that.

Q.  Are you sure in that meeting that Ms. Pherigo reported that -- excuse me -- that Ms. Yeaman reported that Dee Hodge had reached in and grabbed her necklace and put his hands on her shoulders, or was that later in February?

A.  I think it was the first meeting.  She went through a lot, a lot of stuff -- situations she went through.

Q.  And then on February 3rd, 2020, that's when you decided to go and make your report of Dee Hodge; right?

A.  It was Monday, I think, yes.

Q.  Why did you wait another month to go in and make your report?

A.  Like I said, we were waiting for Dee Hodge to retire, and it was a workaround that everyone could live with, and Lindsey was okay with it.

Q.  Did something else happen in the meantime between January 6th and February 3rd that triggered you

to want to go in and report Dee Hodge for sexual harassment, I think is how you described it?

A. Just when Anderson and Dee sent her home in lieu of termination.

Q. Who did what?

A. They sent her home with a notice of termination.

Q. On February 3rd?

A. I'm not sure of the date.

Q. Was it the same day that you went and made the report to the City?

A. No, that was a Monday.

Q. And it was on the Friday before that they had sent her home?

A. Yes, that morning around 9:00 o'clock, I think.

Q. So it was her termination from employment that caused you to want to go in and report Dee Hodge?

A. Yes. He was getting away with it, like he always did.

Q. Let's go to that day. We're on February 3rd. What did you report to the City regarding Dee Hodge?

A. Everything I could remember. I made a mistake. I detailed exactly what steps I was going to

# EXHIBIT C

Q.   Do you know whether or not on January 6th, 2020 -- so this would be, you know, almost a month earlier -- whether Lindsey ever reported anything about Dee to HR?

A.   No.

Q.   Okay.  All right.  And so it's fair to say that you took it literally that you thought Dan would do physical violence on Dee?

A.   Yes.

Q.   And so did you know that Dan was going to come back to work on February 18th?

A.   I think so, yeah.  I -- or I was wondering why he was back at work when I showed up.

Q.   Was it your understanding that he'd been --

A.   Terminated.

Q.   -- terminated?  Okay.

A.   Yeah, or fired or however you want to word it.

Q.   Okay.  So you thought when you didn't see Dan anymore around February 3rd that he had been fired?

A.   Yes.

Q.   Okay.  And did you ever go and talk to Carol about Dan, these -- this violence issue?

A.   Other than this, no.

Q.   Okay.  So we've got this statement on the 18th.  Do you recall talking with Carol before the 18th

# EXHIBIT D

to all my coworkers, and I had a pretty good understanding I was probably going to get fired for what I was about to do, but I have this inability sometimes, so I've just got to act.  So I just asked everyone, "Don't get involved.  You know, I'll put my job on the line."  And I went and made the complaint.

Q.   Was there, like, a group of people together? Did you go one to one to people to tell them?

A.   One to one.

Q.   And what was it exactly you told them?

A.   I told them what I was going to do, not get involved, don't risk your jobs.

Q.   Well, what did you tell them you were going to do?

A.   I was going to bring charges against Dee Hodge for sexual harassment for what he'd done to Lindsey.

Q.   I mean, try to put yourself back in that moment, and which -- can you name an employee that you spoke to?

A.   The guy who's the boss now.

Q.   There's a Rusty?

A.   No.  I can't remember.  The guy that's now in charge that took Dee Hodge's place.  That --

Q.   There's a Dustin Raney?

A.   Dustin Raney, that's it.

Q.  Okay.  So take me back to that day.  You walk in to Dustin Raney, what did you say?  As nearly as you can reproduce it, word for word, what did you say to Dustin Raney?

A.  You mean what Dustin Raney said to me?  Because he filled me in on everything.  And I didn't tell him one way or another what I was going to do.  I needed the weekend to think about it, because it was a big decision.

Q.  So I understood you told me earlier that you had gone around to various people in the --

A.  Yes.

Q.  -- department and told them what you were going to do?

A.  Yes.

Q.  So was Dustin Raney one of those?

A.  Yes.

Q.  So walk me through it, as near as you can recall, what did you tell Dustin Raney that you were going to do, as near as you can get that word for word?

A.  That I was going to bring Dee Hodge up on sexual harassment training to trigger an investigation.  And that's what I told him.  And I told everyone, "Don't get involved.  Don't risk your jobs."

Q.  If Dustin Raney testifies that, quote, On the

morning of February 3rd, 2020, right after work began, Dan approached me and stated that Dee had crossed the line, and when shit hits the fan, I need to stay out of it because he doesn't want anyone else getting hurt, unquote, would you disagree with him?

A.   Not true.  I would strongly disagree with him.

Q.   You didn't make those statements?

A.   No, I did not.

Q.   That Dee Hodge had crossed the line?

A.   No.

Q.   And that shit was going to hit the fan?

A.   No.

Q.   That sounds like something you might have said.

A.   I didn't.

Q.   And that you needed him to stay out of it because you didn't want anyone else getting hurt?

A.   No.  I explained what I was going to do.  And it was as simple as going to HR and making a complaint, but I wanted coworkers not to get involved.

Q.   Who is Rusty Blackner?

A.   An operator.

Q.   Did you know him?

A.   At one time I thought we were pretty good friends, but I guess not.

# EXHIBIT E

A.  About three years, fours years ago.  It was time.

Q.  Did you ever request to have your items returned to you after the termination of your employment?

A.  No.

Q.  Did the City ever offer to return them to you?

A.  No.

Q.  Was anything returned to you?

A.  Nothing.

Q.  And did you send any email or any written communication asking about it?

A.  Nope.  Because I feared getting arrested.  I wouldn't put it past them.

Q.  Was there anything that stopped you from sending an email and saying, "Hey, box up my stuff"?

A.  And who would I send that to?

Q.  Since your employment was terminated, have you become reemployed anywhere?

A.  No.

Q.  Why not?

A.  You've seen me walk.  People don't hire cripples.  And I can't do the job -- my expertise, what I'm good at.  I can't spend eight hours on cement floors.