Kelly H. Andersen (ISB#10511)
David W. Gadd (ISB #7605)
STOVER, GADD & ASSOCIATES, PLLC
905 Shoshone Street North
P.O. Box 1428
Twin Falls, Idaho 83303-1428
Telephone: (208) 736-9900
Facsimile: (208) 736-9929
kha@magicvalleylaw.com
dwg@magicvalleylaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| OTTIS D. PHERIGO, an individual<br><br>        Plaintiff,<br><br>v.<br><br>CITY OF BURLEY, an Idaho municipal corporation<br><br>        Defendant. | Case No.4:21-CV-00364-DCN<br><br>**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 20]** |

## I.    INTRODUCTION

This action arises out of the claims of Ottis Dan Pherigo ("Pherigo") against the City of

Burley for his placements on leave and later termination by the City of Burley ("City"). Pherigo

was hired as a mechanic for the City in 2009 and was later promoted to wastewater technician.

*Decl. Pherigo*, ¶ 3. At the relevant times, Dee Hodge ("Hodge"), head of the wastewater

department, was Pherigo's direct supervisor, Mark Mitton ("Mitton") was the City Administrator

and Carol Anderson was the director of human resources. *Id*., ¶ 4.

 On January 6, 2020, Pherigo accompanied coworker Lindsey Yeaman ("Yeaman") to

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 1**

speak with Carol Anderson ("Anderson"), director of human resources, regarding the mistreatment of Yeaman by Hodge. *Id*., ¶ 4. This mistreatment included bullying and harassment. *Decl. Andersen*, **Ex. D**, 28:6-24. At Anderson's request, Yeaman also spoke with Mitton that day. Shortly afterwards, on January 31, 2020, Yeaman received a Notice of Proposed Termination from Hodge. *Decl. Pherigo*, ¶ 7. Yeaman was placed on administrative leave that same day and subsequently terminated. *Id*., ¶ 8, 12.

On February 3, 2020, Pherigo went to Anderson. *Id*, ¶ 9. He reported that Hodge had sexually harassed Yeaman. *Id*, ¶ 9. That same day, Pherigo was placed on leave. *Id*, ¶ 10. Coworker Dustin Raney ("Raney") later alleged that on February 3, 2020, Pherigo had told him "Dee [Hodge] had crossed the line and when shit hits the fan I need to stay out of it because he doesn't want anyone else getting hurt." *Decl. Andersen*, **Ex. J**. According to Raney's statement, on February 3, 2020, coworker Rusty Blackner ("Blackner") came and told Raney that Pherigo had told him the same thing. *Id*. Coworker Stormy Oldham also reportedly came to Raney concerned about his safety and wondering what they should do. *Id*. On February 4, 2020, Raney told Hodge what the others had said. *Id*. Hodge and Raney went together to City Hall to discuss the matter with Carol Anderson and Mark Mitton. *Id*. At that time, Mitton informed them that he didn't take Pherigo's statements to be threats of a physical nature. Mitton also provided the context that Pherigo had filed a sexual harassment claim against Hodge and they would be contacted by the county administrator for an investigation. *Id*.

In a statement made on February 18, 2020, Blackner claimed that on February 3, 2020, Pherigo told Blackner that Pherigo "was going to kill dee [sic] and that he wanted me and my other co-workers to stay out of the way because he didn't want anyone else to get hurt." *Decl. Andersen*, **Ex. K**.. Blackner maintains that when he didn't see Pherigo at work after February 3,

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 2**

2020, he believed that Pherigo had been fired. *Decl. Andersen*, **Ex. E**, 19:10-20. However, Blackner also stated that he understood Pherigo to be on leave on February 3, 2020 due to Pherigo's grievance over the firing of a coworker. *Id*., **Ex. E**, 17:4-25; 18:1-3. Although Blackner stated that he took the alleged threat to kill Hodge seriously and literally, Blackner never contacted the police about it. *Decl. Andersen*, **Ex. E**, 19:6-25; 20:1-24.; 38:9-18.

On February 5, 2020, at a meeting with the Wastewater department, Raney and his coworkers were informed that "Lindsay's [sic][Yeaman's] termination being strictly due to lack of job performance, and about Dan being placed on administrative leave because he was very emotional and making threats." *Decl. Andersen,* **Ex. J**. This report of Yeaman's termination preceded her hearing and formal termination, which came later. The following day, February 6, 2020, Raney reportedly accompanied coworker Stormy Oldham to speak with Mitton and Anderson about how they were nervous for staff safety and the return of Pherigo to the workplace. *Id*. Anderson took meeting minutes at that time. *Id*. No copies of Anderson's purported notes at that meeting have been produced.

The City asked attorney Kerry McMurray to conduct a quick investigation into the allegations made by Pherigo. *Decl. Andersen*, **Ex. D**, 78:17-25. On February 13, 2020, Pherigo was informed by Mitton that the investigation had found no harassment and Pherigo could return to work on February 18, 2020. *Decl. Pherigo*, ¶ 13.

Pherigo returned to work on February 18, 2020 as instructed. That morning, he informed Hodge that he had a medical appointment and would need to leave early for lunch. *Id*., ¶ 15. That resulted in a disagreement between Hodge and Pherigo. *Id*, ¶ 9, *Decl. Andersen*, **Ex. L**. Hodge accused Pherigo of being drunk and tampering with the PLC systems. *Decl. Pherigo*, ¶ 17. Pherigo defended himself and accused Hodge of harassing Yeaman. *Id*, ¶ 18.

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 3**

Hodge then told Pherigo that he accepted resignations any day of the week. *Id*, ¶ 17-18. Both Hodge and Pherigo separately went to Anderson to report the encounter and provided similar accounts as reflected in the notes of Anderson. *Decl. Andersen*, **Ex. L.** Pherigo stated that he would record future conversations with Hodge, go to the Idaho Labor Board for help, and get a lawyer involved. *Id*. Hodge left to go blow off steam. *Id.* Pherigo left for his scheduled medical appointment. *Decl. Pherigo*, ¶ 23. At no point during that meeting with Pherigo did Anderson inform Pherigo that she had received allegations that he had made threats of violence. *Decl. Pherigo*, ¶ 22, 24; *Decl. Andersen*, **Ex. L; Ex. D**, 118:15-25; 119:1-25.

When Pherigo was gone at his appointment, Hodge asked employees to go to City Hall and make reports regarding the alleged threats. *Decl. Andersen*, **Ex. B**, 70:2-12. That same day Mitton and an officer escorted Pherigo off the premises and told Pherigo that if he returned, he would be cited for criminal trespass. *Decl. Pherigo*, ¶ 25.  As he was escorted off the premises, Pherigo was informed, for the first time, that he had allegedly made comments which his coworkers found to be threatening. *Decl. Pherigo*, ¶ 24. On March 16, 2020 a Notice of Termination of Employment was sent to Pherigo.

Pherigo filed a charge of discrimination and retaliation with to the Idaho Human Rights Commission that was opened on May 27, 2020. *Decl. Andersen*, **Ex. H**. He also mailed a Notice of Tort Claim against the City that arrived on May 6, 2020. *Id.*, **Ex. G**. The City never responded to the Notice of Tort Claim, so it was deemed denied in August of 2020.

On September 13, 2021, Pherigo filed a lawsuit against the City for Retaliation, Discrimination and Violation of the Americans with Disabilities Act. Pherigo also filed a claim for Conversion. The parties have engaged in depositions and discovery. On November 9, 2022, the City filed a Motion for Summary Judgment to dismiss all of Pherigo's claims against the

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 4**

City.

## II.    DISPUTED MATERIAL FACTS

Pursuant to District of Idaho Local Civil Rule 7.1, Pherigo has filed separately with the Court a Statement of Disputed Material Facts with citations to the record, which is, by this reference, fully incorporated herein.

## III.    GOVERNING STANDARD

Summary judgment is appropriate where a party can show that, as to any part of any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record or show that the adverse party is unable to produce admissible evidence to support the fact." *Oldcastle Precast, Inc. v. Concrete Accessories of Georgia, Inc.*, 2019 WL 403865, at *5 (D. Idaho Ja. 31, 2019) (Winmill, J.) (citing Rule 56(c)(1)(A) & (B))).

"If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist." *Id*. In doing so, the "party opposing summary judgment must direct [the Court's] attention to specific, triable facts," *So. Ca. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003), on which the factfinder "could reasonably find for the [non-moving party]," *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 252 (1986); see also *Orr v. Bank of Am.*, *NT & SA,* 285 F.3d 764, (9th Cir. 2002). There must be evidence on which a jury could reasonably find for the non-moving party.

For purposes of the Court's determination of whether there exists a genuine issue of material fact, "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct.

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 5**

2505, 2513, 91 L. Ed. 2d 202 (1986).

## IV.    ARGUMENT

### A.  THE CITY PLACED PHERIGO ON LEAVE ON FEBRUARY 3, 2020 IN RETALIATION FOR HIS SEXUAL HARASSMENT REPORT AGAINST HODGE.

1.  <u>Pherigo's February 3, 2020 involuntary leave predates the alleged reports of violent threats</u>.

Pherigo reported the sexual harassment of coworker Lindsey Yeaman by their supervisor Dee Hodge to Carol Anderson of human resources on February 3, 2020. *Decl. Pherigo*, ¶ 9. That same day, Pherigo was placed on administrative leave. *Id*., ¶ 10. Hodge, the accused harasser, was not placed on leave at any time either for Yeaman's earlier allegations on January 6, 2020 or Pherigo's report on February 3, 2020. *Decl. Andersen*, **Ex. D**, 53:14-18.

According to Mark Mitton, City Administrator, Pherigo was put on leave to "diffuse the situation" and to "just let things calm down." *Decl. Andersen*, **Ex. A**, 29:13-18. In his Declaration, Mitton stated that Pherigo was placed on leave to "let some sense of normalcy return to the workplace." *Decl. Mitton*, ¶ 12. Although Pherigo' s leave came during the sexual harassment investigation into Hodge, Hodge was not placed on leave at any time during the investigation into Hodge's behavior. *Decl. Andersen*, **Ex. A**, 30:24-25; 31:1-10, **Ex. D**, 53:14-18.

The City has not produced any written records to demonstrate that it received complaints of threats allegedly made by Pherigo prior to the leave imposed on Pherigo on February 3, 2020. Coworker Dustin Raney made a statement signed on February 20, 2020 that detailed the events prior to that date. *Decl. Andersen*, **Ex. J**. Raney's statement mentions hearing threats on February 3, 2020 but states that he did not report them until February 4, 2020, the day after Pherigo was placed on leave. *Id*. The significant events preceding Pherigo's February 3, 2020 forced leave were his report of Hodge's sexual harassment of Yeaman that day, and Yeaman's earlier report of Hodge's harassment and forced leave in January. *Decl. Pherigo*, ¶ 4-

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 6**

10.

   2.  Forced, paid administrative leave can be an adverse employment decision.

   Pherigo's forced, paid administrative leave on February 3, 2020, had a materially adverse effect on his employment. His leave came only a few days after Lindsey Yeaman's forced leave on January 31, 2020. By the end of the day on February 3, 2020, Yeaman was already on leave after her complaint made against Hodge in January and Pherigo was on leave after his complaint against Hodge earlier that morning. The forced leave of Yeaman and Pherigo meant that the investigation into the behavior of Hodge occurred at a time when Hodge was not on leave but his two accusers were on forced leave. *Decl. Andersen*, **Ex. D**, 84:8-18; 92:4-11; **Ex. A**, 30:24-25; 31:1-14. At no point in time was Hodge, the accused, placed on leave after Yeaman or Pherigo's reports against him. *Decl. Andersen*, **Ex. A**, 30:24-25; 31:1-14; **Ex. D**., 92:7-11.

   Although Mitton and Anderson had no concerns about conducting a harassment investigation under these circumstances, that decision had negative effects on Pherigo and the investigation. Coworkers who had just observed Yeaman and Pherigo placed on leave after allegations against Hodge were asked for their reports of Hodge's behavior. It was not reasonable to expect an objective and candid investigation to occur under those circumstances.

   Courts have found that forced administrative leave can be an adverse employment decision. *Whitehall v. County of San Bernadino*, 17 Cal. App. 5th 352 (2017). Whitehall was a social worker for the county Children and Family Services (CFS). She was instructed by a supervisor to withhold certain photographs from her investigation and provide altered photographs. Whitehall provided a computer disk to the assigned deputy counsel when she learned that not all the information had been provided. Shortly afterwards, Whitehall was

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 7**

removed from that case and learned that another social worker on the case had been fired for allegedly providing false information.

Together with other social workers. Whitehall filed a motion with the court to inform the court that CFS had perpetrated a fraud. Six days later, Whitehall was placed on paid administrative leave. Her employer argued that her paid leave was not an adverse employment action as she had remained on the payroll. Given the facts of that case, including that the employer was planning her termination during her leave, the court found that Whitehall's paid administrative leave was an adverse employment action.

The *Whitehall* court found that the "temporal proximity between [Whitehall's] report and the County's action of placing [Whitehall] on leave reflects a direct connection." *Id*. at 364. The court found it significant that Whitehall did not request the leave, it was not intended as a reward or accommodation, and the leave coincided with the firing of the original social worker on her case. *Id*. at 367. Those facts indicated that the leave could be an adverse employment action.

A police officer who reported that his lieutenant's suspect interviews constituted physical assault was placed on administrative leave. *Dahlia v. Rodriguez*, 735 F.3d 1060 (9th Cir. 2013). When an internal affairs investigation was launched into the lieutenant, the officer received repeated threats and was told not to say anything to investigators. Four days after the officer reported the lieutenants' misconduct, the officer was placed on forced administrative leave. *Id*. at 1065. *Dahlia* filed a suit against his employer that included a first amendment claim of retaliation. In evaluating the leave, the court inquired as to whether the employment action was "reasonably likely to deter employees from engaging in protected activity." *Id*. at 1078. That court found that his inability to take a promotional exam, loss of opportunities for investigative

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 8**

experience and the general stigma resulting from placement on administrative leave could constitute an adverse employment action. *Id*. at 1079.

The City cites *Parker v. United Airlines, Inc.*, No. 2:19-CV-00045-BSJ, 2021 WL 3206777, at *5 (D. Utah June 28, 2021) to support an assertion that paid leave is not adverse. That case is non-binding precedent from a different jurisdiction and contains a different fact pattern.  In *Parker*, the employee who was placed on leave was the subject of the investigation and her texts and calls had to be evaluated as part of that investigation. Unlike *Parker*, Pherigo was not the subject of the sexual harassment investigation. He was neither the victim nor the alleged perpetrator

The placement of Pherigo on leave did have a materially adverse effect on his employment. It hampered the investigation into Hodge's conduct, had a chilling effect on his coworkers, and strengthened the perception of his coworkers that any complaints about Hodge's behavior could result in forced leave or termination. The proximity of the leave, the same day in fact, as his report, further supports that connection. Pherigo's paid leave was not for his own benefit, but for the benefit of Hodge. Pherigo's his forced leave did eventually end in his termination.

Pherigo engaged in protected activity, namely reports of the inappropriate behavior of Hodge. He suffered materially adverse employment actions which included forced leave and termination. Although the City disputes the causation element, there are genuine issues of material fact regarding causation and all inferences must be drawn in favor of Pherigo, especially in light of the timing of his reports and involuntary leave. Summary judgment on Pherigo's retaliation claims is therefore not appropriate.

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 9**

B.  THE CITY PLACED PHERIGO ON LEAVE ON FEBRUARY 18, 2020 IN
    RETALIATION FOR PHERIGO'S FEBRUARY 18, 2020 REPORT AGAINST DEE
    HODGE.

1.  After the disagreement with Pherigo on the morning of February 18, 2020, Hodge wanted
    Pherigo to be terminated.

February 18, 2020 was Pherigo's first day back at work after his first involuntary leave.

*Decl. Pherigo*, ¶ 14. Early that morning, Pherigo informed Hodge, his supervisor, that Pherigo

had a medical appointment that day and would need to leave for an early lunch. *Id*. at ¶ 15.

Hodge became upset and the two had a disagreement. *Id*. at ¶ 16.  Pherigo, and later Hodge, both

went to Carol Anderson to report the incident. ¶ 21. Carol Anderson took notes of both of those

reports. *Decl. Andersen*, **Ex. L**.

Anderson's notes reveal that the accounts of the disagreement by Hodge and Pherigo

were similar. *Id*. Both agreed that Pherigo stated that he would start wearing a recording device

and that Hodge accused Pherigo of being drunk that morning. *Id*. Both referenced allegations

made by Pherigo about Hodge's behavior towards Yeaman. *Id*. Anderson wrote that "Dee

[Hodge] told Dan [Pherigo] that he accepted resignations any day of the week and Dan said 'I

wouldn't give you the satisfaction.'" *Id*. Hodge then said to Anderson "How is it that an

employee can come in and behave like that and it is okay?" *Id*.

After that encounter, Hodge wrote a statement of his own against Pherigo and gave it to

Anderson. *Decl. Andersen*, **Ex. B**, 70:1-9; **Ex. Q**. In his statement, Hodge alleged that several

employees had come to him with claims that Pherigo "warned them if they see anything happens

to stay out of it because he doesn't need anyone else hurt. [sic] Our department is on edge that he

will return to work and either do some physical violence or shoot everyone there." *Id*., **Ex. Q**.

Hodge also asked the others to go up to City Hall to report what Pherigo had alleged said.

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 10**

*Id.,* **Ex. B**, 70:7-22. Several employees complied with Hodge's request and made statements. Rusty Blackner's statement alleged that on February 3 after Lindsey [Yeaman] was told to leave work on Friday and dan [sic][Pherigo] told me that he was going to kill dee[sic] and that he wanted me and my other co-workers to stay out of the way because he didn't want anyone else to get hurt." *Decl. Andersen*, **Ex. K**. Stormy Oldham provided a statement alleging that back on February 3, "Dan come in set down upset and said Dee hurt someone he cared about and he wont [sic] me to stay out of whatever was going to happen and to till [sic] glen stay [sic] out it [sic] because he didn't want us hert[sic]!. *Decl. Andersen*, **Ex. R**.

Dustin Rainey also made a statement. *Decl. Andersen*, **Ex. J**. This statement was signed on February 20, 2020 but includes information about previous dates. Interestingly, Raney mentions that he had already spoken with Blackner on February 3, 2020 with concerns about Pherigo. Raney went with Hodge to speak to Anderson and Mitton the following day. *Id*. Mitton was there and told everyone that he didn't think the threats were of a physical nature. *Id*., **Ex. J**. Only Blackner's later statement alleged a specific threat of violence. The statements by Raney and Oldham state that Pherigo didn't want people to get hurt. Raney and Oldham interpreted those statements to be threats of violence.

Based on the available information, it appears that Pherigo's coworkers and Hodge had already reported Pherigo's statements to Anderson and Mitton and were told that the statements were not interpreted as threats of violence. *Id*., **Ex. J, Ex. A,** 43:10-25. It was not until after Hodge's disagreement with Pherigo and Hodge's request that his employees make statements on February 18, 2020 that those statements were treated differently. As Pherigo stated at his termination hearing regarding the imposed leave, Hodge had a nice two weeks to mop everything up. *Decl. Andersen*, **Ex. O**.

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 11**

The timing of the written statements, done at Hodge's request after his disagreement with Pherigo, and Hodge's statement to Anderson that he didn't think that an employee should be able to treat him that way and he accepted resignations any day of the week show that Hodge had a role in effectuating Pherigo's termination. The fact that Mark Mitton is the individual who showed up with an officer to escort Pherigo off the premises doesn't eliminate Hodge's role in the leave and termination. There are genuine issues of material fact that Pherigo's leave and termination were in retaliation of his reports against Hodge.

2. <u>Pherigo was fired for his disability as well as for filing a complaint about Yeaman.</u>

Pherigo is an individual with a qualified disability. He suffers from severe rheumatoid arthritis. *Decl. Pherigo*, ¶ 42. This disability required Pherigo to take leave from work at times and sometimes use a cane at work. *Id.*, ¶ 43.

Hodge had a history of questioning sick leave and giving Pherigo a difficult time about his leave for his disability. In October of 2018, Pherigo's medications were changed and he missed some work. *Decl. Pherigo*, ¶ 39. When Pherigo returned to work, he asked his coworkers why his belongings were packed up. His coworkers informed Pherigo that Hodge had instructed them to do that because Pherigo had been terminated. *Id*. Pherigo went to Carol Anderson to ask about this purported termination. Shortly thereafter, Pherigo was told that he was not terminated and given a letter that he could have time off. It also instructed Pherigo to contact Hodge for further accommodations. *Id.*, ¶ 40-41, *Decl. Pherigo*, **Ex. A**.

In one of Hodge's employee evaluations of Pherigo, Pherigo was rated poorly for attendance with the note "Absent from Health issues. No vacation or sick leave accumulates." *Decl. Andersen*, **Ex. P**. Hodge assigned Pherigo the goal of "Work Hard to be Healthy." *Id. Decl. Andersen*, **Ex. B**, 113:17-25; 114:1-25. Giving an employee the goal to be healthy is not an

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 12**

accommodation for a disability. There is no evidence that hard work can cure arthritis.

When asked about the purported termination incident in 2018, Carol Anderson stated that she had no concerns about requiring Pherigo to ask further leave from Hodge. *Decl. Andersen*, **Ex. D**, 48:5-25; 50:1-25; 51:1-2. Mitton had heard rumors that Pherigo's coworkers were told to pack up his things because Pherigo had been fired. *Decl. Andersen*, **Ex. A**, 21:10-25; 22:1-25; 24:3-12. In his investigation into the sexual harassment allegations against Hodge, Kerry McMurray discovered that female employees felt that requests for leave did not require much explanation from male coworkers but female coworkers had to include intimate details of why they needed to sue sick leave. *Decl. Andersen*, **Ex. M**, Page 9. Evidence on the record reflects that Hodge did not properly handle medical leave.

The disagreement between Pherigo and Hodge on February 18, 2020, which caused Pherigo's leave and in part led to his termination, began with Pherigo's request for time off to attend a previously scheduled medical appointment. *Decl. Andersen*, **Ex. L**; *Decl. Pherigo*, ¶ 15-24. Pherigo is an individual with a disability protected under the ADA. He was discriminated against because of his need to attend a medical appointment related to his disability. This resulted in the adverse actions of forced leave and termination. There are genuine issues of material fact regarding Pherigo's leave and termination related to his disability. All factual inferences should be made in Pherigo's favor and make summary judgment inappropriate.

C.   THE ALLEGATIONS OF VIOLENCE AGAINST PHERIGO WERE CONFLICTING, INCONSISTENT AND A PRETEXT FOR PHERIGO'S LEAVE AND TERMINATION.

As discussed above, Pherigo's first imposed leave on February 3, 2020 came before any reported threats of violence and therefore could not be attributed to those threats. It was also on the same day that Pherigo made allegations that Hodge had sexually harassed Pherigo's

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 13**

coworker, Yeaman. *Id*. at ¶ 10.  Pherigo's second imposed leave occurred on February 18, 2020, also a day when he reported the behavior of Hodge. *Decl. Pherigo*, ¶ 25. Twice, in the same month, Pherigo was placed on forced leave on the same day that he reported the misconduct of Hodge. The inconsistencies of the coworker statements against Pherigo make it clear that the allegations were used as a pretext by the City to terminate the employment of someone who stood up to their department head, Hodge.

The City claims that it had no knowledge of any allegations of threats made by Pherigo until February 18, 2020. *Statement of Material Facts*, ¶ 11. "Although Plaintiff [Pherigo] made the threats on February 3, 20202 [sic], the City did not become aware of them until after he returned to work on February 18, 2020." *Id*. That narrative is not accurate because the City has documentation that it received reports and didn't take those reports literally.

The investigative report on sexual harassment made by Kerry McMurray, with a date of February 10, 2020 contained a paragraph stating that some of Pherigo's coworkers had concerns about statements made by Pherigo. *Decl. Andersen*, **Ex. M,** Page 9. According to the allegations, the statements were all made by Pherigo on February 3, 2020, the day that Pherigo went to report Hodge for sexual harassment. The context of Pherigo's statements provides important information necessary for their interpretation. Pherigo made statements to his coworkers prior to his report of Hodge to Carol Anderson on February 3, 2020. *Decl. Andersen*, **Ex. J, Ex. K., Ex. R**.

Raney had already reported the comments of Pherigo to Mitton and Anderson in the presence of Hodge on February 4, 2020. *Id.*, **Ex. J.** Raney made this report after speaking with Rusty Blackner. Raney noted that Rusty [Blackner] "informed me that Dan had told him the same thing." Raney doesn't mention hearing any specific threats to kill Hodge. *Id*. Presumably,

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 14**

as Blackner discussed the statements by Pherigo that concerned him, Blackner would have included a threat to kill Hodge if one had been made.

Mitton explained to Raney and Hodge the context of the statements, namely that Pherigo had filed a sexual harassment charge against Hodge. *Id*. Mitton didn't take Pherigo's statement to be physical in nature. *Decl. Andersen*, **Ex. A**, 43:10-25. Stormy Oldham and Raney returned to speak with Anderson and Mitton on February 6, 2020 and discussed safety concerns about Pherigo. Mitton received those statements and did not express any concern.

The only new information to arise on February 18, 2020 was that Pherigo and Hodge had a disagreement. Pherigo's alleged statements had already been made a reported. Hodge wanted Pherigo's resignation that day but Pherigo refused to provide it. *Id.*, **Ex. L**. Hodge then made his statement against Pherigo and requested others to make their statements against Pherigo and provide them to City Hall. *Id.*, **Ex. B**., 70:2-22. With these efforts of Hodge, made while Pherigo was at a medical appointment, Hodge succeeded in having previously reported statements interpreted in a way that resulted in Pherigo's forced leave and termination. Hodge had already accompanied Raney to speak with Anderson and Mitton about the statements. *Id*, **Ex. J**. There was no reason to return to the same people and request their statements except Hodge's desire to have Pherigo terminated.

The City alleged that it had not previously heard Blackner's statement that Pherigo said that he would kill Hodge. Blackner's statement is not credible. *Decl. Andersen*, **Ex. K**. Blackner had already spoken with Raney on February 3, 2020 and they agreed that they had heard the same statements from Pherigo. Raney never made an allegation that Pherigo said that he would kill Hodge nor reported an allegation of death threats. *Decl. Andersen*, **Ex. J**. In order for Blackner's statement to be credible, one would need to believe that Blackner simply forgot to

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 15**

mention to Raney that Pherigo made a specific death threat or that Raney heard the death threat repeated by Blackner but forgot to mention it to Anderson the following day. *Id*. Although Blackner said that he took the alleged death threat on February 3, 2020 literally and seriously, he never called police to report the threat. *Decl. Andersen*, **Ex. E**, 38:9-18. Inexplicably, Blackner was not concerned that Pherigo would kill Hodge outside of work. If Blackner actually believed the purported threats, he would have notified police.

In addition, the report to Anderson on the morning of February 18, 2020 showed that Pherigo's threats were not physical. *Id*., **Ex. L**. Pherigo threatened to "wear a recorder to protect myself." *Id*. Pherigo also said that "he was going to the Idaho Labor Board to get help." *Id*. He stated that he "would get legal council [sic] and that he would have detailed logs of what is going on." *Id*. The measures threatened by Pherigo were legal and non-violent.

The City alleges that Pherigo did not present any evidence or explanation at his hearing on March 5, 2020. *Memorandum*, Page 5. This is inaccurate. *Decl. Andersen*, **Ex. O**. The basis for Pherigo's termination was the purported threats, not job performance. Pherigo testified that he didn't do anything wrong and didn't say the things that he accused of saying. *Id*., Other than deny that he made the alleged threats of violence, Pherigo had nothing else that he could do to defend himself from allegations of making threats. At his hearing, Pherigo made it clear that he understood Dee [Hodge] to be behind his termination and used Pherigo's forced leave to arrange things. "He had a nice two weeks to wipe everything up, that's fine." *Id*. *Decl. Andersen*, **Ex. O**. There are genuine issues of material facts relating to the nature and credibility of the allegations that Pherigo threatened violence and whether those allegations were the motivation for his leave and later termination. Summary judgment is not appropriate on this issue.

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 16**

D. PHERIGO MADE A DEMAND FOR POSSESSION AND HAS A VALID CONVERSION CLAIM AGAINST THE CITY.

Pherigo has a valid claim of conversion against the City. Conversion is any distinct act of dominion wrongfully exerted over another's personal property or in denial or inconsistent with his rights therein. *Gissel v. State*, 111 Idaho 725, 727, 727 P.2d 1153, 1155 (1986). It is an intentional exercise of dominion or control over a chattel which so seriously interferes with the rights of another to control it that the actor may justly be required to pay the other the full value of the chattel. *Id*.

The circumstances of Pherigo's departure from City property were unique. Pherigo was approached by Mitton and an officer without warning, accused of making threats for the first time, and escorted off the premises. *Decl. Pherigo*, ¶ 24. He was not given time to gather his belongings. *Id.* Pherigo was informed that if he returned to City property, he would be cited for criminal trespass. *Id.* at 25. Given Pherigo's previous incarceration in connection with the violation of a weed ordinance in his yard, Pherigo took the threat of criminal trespass very seriously. *Id.* at ¶ 26-30. City employees also had the understanding that Pherigo was not allowed to return to City property on threat of trespass. *Decl. Andersen*, **Ex. A.**, 87:12-25; 88:1-20; **Ex. D**, 139:8-19; **Ex. E**, 38:19-25; 39:1-10.

Carol Anderson recalled reading in Pherigo's complaint with the Idaho Human Rights Commission that Pherigo had alleged that he was not allowed to retrieve his personal property. *Decl. Andersen*, **Ex. D**, 140:3-25, 141:1-12. She was not aware of anyone taking any actions to assess what Pherigo's property was or how it could be returned to him. *Id.* Mitton was also unaware of any efforts to make sure that Pherigo's tools were returned to him. *Id.*, **Ex. A**, 89:19-25; 90:1-23.

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 17**

The City argues that there is no conversion of the personal property of Pherigo because there can be no conversion if the possessor does not appropriate or use the property in any fashion contrary to the owner's interests unless a proper demand is made for possession and that the possessor rightfully refused delivery. *Peasley, Transfer & Storage, Co. v. Smith*, 132 Idaho 732, 7443-44, 979 P.2d 605, 616-617 (1999). In *Peasley*, the property in question was taken under a valid judgment lien.

Pherigo did make a demand for the possession of his personal property. *Decl. Pherigo*, ¶ 31. This demand was made through counsel in the Notice of Tort Claim and the paperwork filed before the Idaho Human Rights Commission that was forwarded to the City. *Decl. Andersen*, **Ex. G, Ex. H**. Despite the notice of trespass in place and knowledge of Pherigo's claims, the City has made no efforts to return Pherigo's personal property.

Pherigo still wants his personal property, including his tools, to be returned. *Decl. Pherigo*, ¶ 31. Although he did receive a benefit by having his personal tools available for his own use to assist him with his job duties during his employment with the City, Pherigo receives no benefit from the tools remaining with the City. *Id.* It is contrary to Pherigo's interests for his personal property to remain in the possession and control of the City, especially as Pherigo no longer works for the City. The City's continued possession of Pherigo's tools despite his requests for their return constitutes conversion. There are genuine issues of material fact regarding Pherigo's claim for conversion against the City and summary judgment on those claims is not appropriate.

## V.    CONCLUSION

For the foregoing reasons, Pherigo respectfully submits that there are genuine issues of material fact that preclude the entry of summary judgment and requests that the Court deny the

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 18**

City's Motion.

DATED this 30th day of November, 2022

STOVER, GADD & ASSOCIATES, PLLC

By  /s/ Kelly H. Andersen
      Kelly H. Andersen

## CERTIFICATE OF SERVICE

I hereby certify that I served a true and correct copy of the foregoing document upon the following this 30th day of November, 2022, by the method indicated below:


Blake G. Hall                                    [X] CM/ECF
Sam L. Angell
Dillon S. Erickson
Hall Angell & Associates, LLP
1075 S. Utah Avenue, Suite 150
Idaho Falls, Idaho 83402
Email:
bgh@hasattorneys.com
sla@hasattorneys.com
dse@hasattorneys.com


                                    _/s/ Kelly H. Andersen_____
                                    Kelly H. Andersen