Kelly H. Andersen (ISB#10511)
David W. Gadd (ISB #7605)
STOVER, GADD & ASSOCIATES, PLLC
905 Shoshone Street North
P.O. Box 1428
Twin Falls, Idaho 83303-1428
Telephone: (208) 736-9900
Facsimile: (208) 736-9929
kha@magicvalleylaw.com
dwg@magicvalleylaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| OTTIS D. PHERIGO, an individual<br><br>Plaintiff,<br><br>v.<br><br>CITY OF BURLEY, an Idaho municipal corporation<br><br>Defendant. | Case No.4:21-CV-00364-DCN<br><br>**DECLARATION OF COUNSEL, KELLY ANDERSEN, IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT [DKT. 20]** |

I, KELLY H. ANDERSEN, hereby swear under penalty of perjury as follows:

1.    I am over eighteen years of age and I make this declaration based upon my own personal knowledge unless otherwise stated.

2.    I am one of the attorneys of record for Plaintiff Ottis D. Pherigo.

3.    On August 29, 2022, Plaintiff took the deposition of Mark Mitton. Attached hereto as **Exhibit A** are true and correct copies of relevant excerpts of said deposition.

4.    On August 29, 2022, Plaintiff took the deposition of Dee Hodge. Attached hereto as **Exhibit B** are true and correct copies of relevant excerpts of said deposition.

**DECLARATION OF COUNSEL, KELLY ANDERSEN, IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 1**

5.     On September 12, 2022, Plaintiff took the deposition of Dustin James Raney. Attached hereto as **Exhibit C** are true and correct copies of relevant excerpts of said deposition.

6.     On September 12, 2022, Plaintiff took the deposition of Carol Anderson. Attached hereto as **Exhibit D** are true and correct copies of relevant excerpts of said deposition.

7.     On September 12, 2022, Plaintiff took the deposition of Rusty Blackner. Attached hereto as **Exhibit E** are true and correct copies of relevant excerpts of said deposition.  19:10-20.

8.     On September 12, 2022, Plaintiff took the deposition of Chelsey Ferrin. Attached hereto as **Exhibit F** are true and correct copies of relevant excerpts of said deposition.

9.     I sent a Notice of Tort Claim to the City of Burley on May 20, 2020 on behalf of Plaintiff. Attached as **Exhibit G** is a true and correct copy of that Notice of Tort Claim.

10.     I submitted paperwork to the Idaho Human Rights Commission on behalf of Plaintiff. Attached as **Exhibit H** is a true and correct copy of the Attachment to the Idaho Human Rights Commission.

11.     Attached as **Exhibit I** is a true and correct copy of the partial notes of Carol Anderson of the report that Yeaman made to Carol Anderson and Mark Mitton regarding Dee Hodge on January 6, 2020, provided in discovery as Burley0019-Burley0020.

12.     Attached as **Exhibit J** is a true and correct copy of the signed statement of Dustin Raney signed on 2/20/2020, provided by the City in discovery as Burley 000002.

13.     Attached as **Exhibit K** is a true and correct copy of a statement signed by Rusty Blackner dated February 18, 2020 and produced by the City in discovery as Burley 000003.

14.     Attached as **Exhibit L** is a true and correct copy of the notes of Carol Anderson from February 18, 2020 produced by the City in discovery as Burley000006-Burley000009.

15.     The City has not produced its notes from the meeting of Pherigo with Anderson

**DECLARATION OF COUNSEL, KELLY ANDERSEN, IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 2**

on February 3, 2020. The only information provided by the City related to that interaction is a sentence on a chart that reads "Dan complains that Dee Hodge sexually harassed Lindsay Yeaman."

16.     Attached as **Exhibit M** is a true and correct copy of the Sexual Harassment Report conducted by Kerry McMurry and produced by the City.

17.     Attached as **Exhibit N** is a true and correct copy of selected pages of the Deposition of Dan Pherigo which was taken on June 9, 2020.

18.     Attached as **Exhibit O** is a true and correct copy of the notes for the termination hearing of Pherigo dated March 5, 2020 and produced by the City as Burley000011-Burley000012.

19.     Attached as **Exhibit P** is a true and correct copy of the Employee Evaluation of Dan Pherigo performed by Dee Hodge dated April 22, 2016 provided by the City of Burley in discovery as Burley000098-Burley000099.

20.     Attached as **Exhibit Q** is a true and correct copy of the signed statement made by Dee Hodge on February 18, 2020 that was provided by the City in discovery as Burley 0000058.

21.     Attached as **Exhibit R** is a true and correct copy of the signed statement made by Stormy Oldham on February 18, 2020 that was provided by the City in discovery as Burley 000060.

**DECLARATION OF COUNSEL, KELLY ANDERSEN, IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 3**

I certify (or declare) under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

DATED this 29 day of November, 2022

By _____
Kelly H. Andersen

## CERTIFICATE OF SERVICE

I hereby certify that I served a true and correct copy of the foregoing document upon the following this 30th day of November, 2022, by the method indicated below:


Blake G. Hall                                    [X] CM/ECF
Sam L. Angell
Dillon S. Erickson
Hall Angell & Associates, LLP
1075 S. Utah Avenue, Suite 150
Idaho Falls, Idaho 83402
Email:
bgh@hasattorneys.com
sla@hasattorneys.com
dse@hasattorneys.com


                                    /s/ Kelly H. Andersen
                                    Kelly H. Andersen


**DECLARATION OF COUNSEL, KELLY ANDERSEN, IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT [DKT. 20]– Page 5**

# EXHIBIT A

**DECLARATION OF COUNSEL KELLY ANDERSEN, IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT [DKT.20] – EXHIBIT A**

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


OTTIS D. PHERIGO, an individual,) Case No. 4:21-cv-364

                Plaintiff,    )

vs.                              )

CITY OF BURLEY, an Idaho      )

municipal corporation,        )

                Defendant.    )

_____)


DEPOSITION OF MARK MITTON

AUGUST 29, 2022


REPORTED BY:

GRETCHEN SISK, CSR NO. 1125

NOTARY PUBLIC

A. Yes.

Q. Okay. All right. And do these rules, are these causes of action for being disciplined, would they apply to the department heads as well, or just to the employees within the department?

A. To every employee.

Q. Okay. So if we were to look at number 13 on page 32, "Discourteous treatment of the public or other employees." Are you aware of Mr. Hodge ever engaging in discourteous treatment to other employees?

A. I don't remember if there was any -- ever -- if he was ever disciplined for that.

Q. Do you know if he ever engaged in discourteous treatment of the public or other employees?

A. Probably, yes, he did.

Q. Okay. So a department head has the responsibility to discipline employees in his department. If the department head violates these rules, such as number 13, whose responsibility is that to discipline the department head?

A. Supervisor.

Q. Okay. Who is the supervisor of Mr. Hodge?

A. Me.

Q. Okay. So City administrator?

A. Yes.

So the complaint procedure, moving on to page 75, says that, "A person who feels harassed, discriminated, or retaliated against may initiate the complaint process by filing a written and signed complaint with the City Administrator, City Clerk, Department head or Human Resource Analyst."

So in the case of Dan here, looks like he had the option to give a written signed complaint either to you, City administrator; a City clerk, do you know who that is or who that was at the time?

A.   Ellen Maier.

Q.   Okay.  Department head would have been?

A.   Dee Hodge.

Q.   And human resource analyst?

A.   Carol Anderson.

Q.   Okay.  Are you aware of any written complaint that was made by Dan regarding sexual harassment?

A.   I don't remember one.  I know that he came in and verbally complained.

Q.   Do you recall providing Dan with the opportunity to make a written complaint?

A.   I don't remember.

Q.   Okay.  It says in that same paragraph, "The complainant" or the employee making the complaint, "may use the complaint form which attached to this policy."

Are you aware if there is a complaint form attached to the policy?  I will say I was unable to find it, but are you aware of whether there is a complaint form?

A.  I don't see one, so I wouldn't think there is one.

Q.  Do you know if the City had a complaint form? Maybe not in this policy, but if it has a written complaint form for sexual harassment?

A.  No.

Q.  Who would be aware of whether the City had one?

A.  Carol.

Q.  Okay.  So if Carol is not aware of one, it would it be fair TO say there isn't a written complaint form?

A.  Probably.

Q.  Okay.  Would that just be an oversight, in your opinion, if there's no written complaint form?

A.  Yes.

Q.  Okay.  So following on the procedure, the following paragraph says, "...the City Administrator" which would be you, "would notify the City, and review the complaint with..." "...legal counsel."

Did you -- do you recall notifying the City's

A.  Yes.

Q.  Do you know whether or not she actually did?

A.  I don't.

Q.  Okay.  All right.  Let's move on to our next exhibit.

        (Exhibit 2 marked for identification.)

BY MS. ANDERSEN:

Q.  Okay.  If you could take a look that for me. And does that look familiar to you?

A.  Yes.

Q.  Okay.  Is this a true and correct copy of a letter that you signed to Dan on October of 2018?

A.  Sure looks like it.

Q.  Okay.  Do you recall the circumstances of this letter?

A.  Yes.

Q.  Could you share those with me?

A.  Dan was missing some time and not fully fulfilling his duties and he was concerned.  So Carol and I went down and met with him, Dan, at the wastewater treatment plant and had a discussion with him.  And he said -- he didn't request a reasonable accommodation, but he said he was taking a medication and needed some

time to get used to it.  So I sent him this letter saying, okay, without -- I interpreted that as a reasonable accommodation, so I sent this letter to him saying that that was a reasonable request.

Q.  Do you recall what medical condition needed to be accommodated?

A.  He just said new medication.

Q.  Okay.  For a condition.  Do you recall -- I'll put it this way:  How did you know that Dan was missing time?  Were you checking his time cards?

A.  No, the -- Dee said he was missing time and not very productive at work and...

Q.  Do you recall Dan coming to Carol around this time and telling her that Dee had told his co-workers he was fired?

A.  No.

Q.  So the impetus of this letter was Dee Hodge coming to you to complain -- or to inform you that Dan was missing time and not getting work done?

A.  Yeah.

Q.  So you have no knowledge of whether Dee told Dan's co-workers that Dan was fired when he was home sick?

A.  That was a rumor, but he never told me that.

Q.  Where did you hear that rumor from?

if the rumors --

A.  Not generally.  They're rumors.

Q.  Okay.  Were you confident that Dee Hodge would give Dan the time off if needed for his medical condition?

A.  Yes.  After we met, we told Dee that he needed -- he made a request for an accommodation without specifically using the words, and that he should be accommodated.

Q.  Okay.  Dee didn't express any objection to you about that?

A.  No.

Q.  Okay.  All right.  Let's move on.  Are you aware of any workplace violence reports or rumors?

A.  About what?

Q.  Let's say in the wastewater department in the last ten years?

A.  Well, I don't really know how to answer that question.  Can you rephrase it --

Q.  Sure.

A.  -- more specifically?

Q.  Have you heard any rumors or reports that Rusty Blackner chased Jason Sharer with a shovel?

A.  No.

Q.  Never heard that before?

A.   Never heard that.

Q.   Would you consider chasing a co-worker with a shovel to be an instance of workplace violence?

MR. ANGELL:  Objection to the form of the question.

Go ahead if you can.

THE WITNESS:  Not knowing the facts, I don't know.


BY MS. ANDERSEN:

Q.   Okay.  So let's go to the date when Dan came in to report the sexual harassment of Ms. Yeaman by Mr. Hodge.  February 3rd, 2020; does that sound correct?

A.   I suppose.

Q.   Okay.  And so we talked about the action you took.  You enlisted the help of Kerry McMurray?

A.   Yes.

Q.   And what about leave at that time, on February 3rd, was Dan placed on leave?

A.   I don't remember.

Q.   Okay.  Whether he was placed on leave after he made the report, you don't recall whether or not he was? Do you recall whether or not Dee was placed on leave after Dan made the report?

A.   I don't remember.

Q.   Okay.   Who would make the decision whether Dan should go on leave after making a report?

A.   Probably Carol and I.   Every -- anyone who may be involved at times can be placed on paid administrative leave.

Q.   Okay.   Would you consider Dan as someone who reported the sexual harassment of Lindsey by Mr. Hodge to be a person involved?

A.   Yes.

Q.   Okay.   Can you explain?

A.   Well, there was a lot of turmoil going on because of Lindsey's discipline and Dan's complaint, and we still needed to make sure the wastewater plant operates and it remains in compliance, so we were trying to calm down the situation.   And so if Dan was placed on administrative leave, it was just to calm down the position.

Q.   Is it the City's position that Lindsey Yeaman was terminated for poor job performance?

A.   Yes.

Q.   And can you explain the turmoil that that termination caused, in your opinion?

A.   Well, when someone gets terminated, it creates turmoil in a department.   That's just the way it is, because the employee will say things.   We usually don't

A.   We hoped it would.

Q.   Is it your opinion that it actually did?

A.   I don't know.  I'm not there every day, I couldn't tell you.

Q.   How often are you in the wastewater department?

A.   Occasionally.

Q.   Would you say that the notice of termination of Ms. Yeaman and Mr. Pherigo's report caused you to be in the wastewater department, say, more often than usual at this particular time?

A.   No.

Q.   Okay.  So we've discussed -- you don't recall who put Dan on leave or how the decision was made?  No recollection there?

A.   I recall that we went and talked to Dan, said we're trying to diffuse the situation, just go home and take some time off, just let things calm down.

Q.   And when you say, "we," who was the we?

A.   I don't know.  I think Carol may have been with me.  I don't recall.

Q.   And you don't recall if that was the same day that Dan made his report or if that was a different day?

A.   I believe it was a different day.

Q.   Okay.  Do you recall the duration of Dan's

leave?

A.   No.

Q.   Do you recall having in mind a specific amount of time for the leave?

A.   No.

Q.   Or purpose for the leave?

A.   The purpose for the leave Was just to calm down all the emotions at the wastewater department.

Q.   Did you consider Dan to be the person to have the most emotion in the wastewater department?

A.   Fair amount.

Q.   Any others you can think of that had emotion at this time in the wastewater department?

A.   Other employee concerns; but, you know, they were concerned with Dan's reaction to the sexual harassment.

Q.   Okay.  So they were concerned about Dan's claim of sexual harassment; is it the investigation of the harassment or just the harassment, itself?

A.   Just things they'd said to him about the harassment or about the investigation, just the things they had said to -- they indicated to me that he had said to them.

Q.   Okay.  And we'll get to that soon.

Do you think that conducting a sexual

harassment investigation when the two workers who reported Dee Hodge were placed on leave?

A.   No.

Q.   Do you think that hindered the investigation in any way?

A.   No.

Q.   Do you think it made any co-workers afraid to speak up against Dee, given that the two people who had were currently on leave?

A.   No.

Q.   Do you feel that Dee Hodge's presence in the office during the investigation made it difficult for employees to speak candidly about him?

A.   No.

Q.   Do you know whether Kerry McMurray spoke with employees in the office while Dee was present, or that he spoke to him at a different location?

A.   I do not know.

Q.   Do you know whether any efforts were made to ensure employees that they would be protected in any complaints they might make against Dee Hodge as part of the investigation?

A.   I'm -- I know't know.  I -- I specifically didn't talk to them during investigation.

Q.   Okay.  Was there any other lead operator that

could have taken the place of Dee -- anyone qualified to take the place of Dee during the time of this investigation into sexual harassment?

A.   Yes.

Q.   Who would that have been?

A.   Dustin Raney.

Q.   Was there a discussion whether Dustin Raney should take over for Dee during the investigation?

A.   No.

Q.   Okay.  Why is that?

A.   We just didn't discuss it.

Q.   Okay.  When was the suggestion made that Dan could return to the office?

A.   Don't remember.

Q.   Do you know who made the decision for Dan to return to the office?

A.   No.

Q.   Do you recall how Dan was informed that he could return to the office?

A.   No.

Q.   Okay.  Do you recall if his return was tied at all to the completion of the investigation?

A.   No.

Q.   Okay.  All right.  Do you know if any mention of the sexual harassment allegations were ever placed in

quote, calm things down, and then left on leave because of worker concerns about safety?

A.    Correct.

Q.    Okay.  Do you recall whether Dustin was asked to make a statement when he came in, in February 4th?

A.    He was one of the ones that was concerned about his safety and he wanted to have them express what it was; so yes, he was probably requested to write things down.

Q.    Okay.  And that third paragraph, Dustin says, Mark told us that he didn't believe that Dan meant anything about his statements being of a physical nature.  He also informed us that Dan had filed a sexual harassment claim against Dee and that we would both be being contacted by the county administrator, who would be conducting an investigation for questioning.

So it seems to me that maybe you provided them some context as far as whatever was between Dan and Dee; looks like you explained that Dee had filed a complaint against Dee for sexual harassment, which maybe gives some context to some of their concerns or some of the statements made about Dee by Dan.  Do you recall telling them that you didn't think Dan's statements meant anything being of a physical nature?

A.    I probably did at the time, yes.

A.  Yes.  Yeah.

Q.  Okay.  Is there a reason why you waited until February 18th to speak with Dan about concerns about workplace violence?

A.  I don't know why.

Q.  Okay.  Seems like that would be well after these other co-workers say that they reported that he had made these threats?

A.  I don't know why that timeline is -- I just don't remember.

Q.  Did you feel a need at any point to follow up with Dan to see if these allegations were true or if he admitted or denied them?

A.  No.

Q.  Do you recall asking Carol to follow up on any of those allegations or to check with Dan?

A.  I don't remember.

Q.  Okay.  Do you think it would have been appropriate to speak with Dan prior to February 18th if you were getting reports of violence in early February about Dan?

A.  I don't really understand the question.

Q.  Okay.  Do you feel that February 18th would have been a good time to speak to Dan about the threats of violence that occurred more than a week before?

A.   I don't know.

Q.   Okay.  All right.  You don't recall why the date February 18th was significant or why that might have been the date when the conversation occurred?

A.   No.

Q.   Okay.  All right.  Let's move on.

(Exhibit 8 marked for identification.)

BY MS. ANDERSEN:

Q.   Okay.  I'll give these to you and I will let you know that this is something that we received from the City, if you could take a look, if you know who might have made these the notes.  Looks like they have a date of February 18th, 2020.  My guess is maybe they were Carol's notes, but I would appreciate if you have any insight as to who might have taken those notes.

A.   I don't know whose notes they are.

Q.   Okay.  Let's take a look.  Let's start at the top, looks like this is February 18th, so this is the date we were talking about earlier, 8:47 a.m.  Dan came into my office and asked if he could speak with me.  Mentions that he had a doctor's appointment, and it brings up Dee.

        "Dee told him that CST has been making changes

BY MS. ANDERSEN:

Q.   Do you feel that Lindsey would be comfortable expressing herself in front of Dee given these allegations?

MR. ANGELL:   Object to the form of the question.

THE WITNESS:   Yes.

BY MS. ANDERSEN:

Q.   Okay.   All right.   So it says at that same page, "The investigation also brought forward that Dee Hodge can be stern, demeaning, even condescending in his managerial approach to employees."

Did that statement concern you at all?

A.   When I read it, all this -- when Dan came in and complained, this is the first time I had seen these -- these causes, and that was what created the investigation.   After I read the report, it did cause me some concern.

Q.   Okay.   I guess I'm specifically asking about --

A.   It caused me some concern.

Q.   Okay.   About him being stern, demeaning, and condescending?   Did you feel that that would be -- that

would qualify as discourteous treatment of public employees?

MR. ANGELL:  Object to the form.

THE WITNESS:  Borderline.

BY MS. ANDERSEN:

Q.  Okay.

A.  It was probably borderline behavior.

Q.  Okay.  So being condescending and demeaning is potentially or borderline discourteous?

A.  Yes.

Q.  Okay.  Do you recall whether anybody met with Dee after he received this report to discuss what was found?

A.  Yes.

Q.  Okay.  Who met with Dee?

A.  Carol and I did.

Q.  Okay.  Did you provide Dee with a copy of this report?

A.  Yes, I believe so.

Q.  A written copy of the report?  Do you recall reviewing the report with Dee?

A.  I don't know that we went over it --

Q.  Okay.

A.  -- I think we provided him with a copy.

Q.   Okay.   Do you remember whether Lindsey Yeaman was given a copy of this report?

A.   I don't know.

Q.   Okay.   You didn't personally give her one?

A.   I did not.

Q.   Okay.   Do you recall whether you wrote anything up on Dee's employee file based on the findings of this report?

A.   I don't recall doing that.

Q.   Do you feel it would be appropriate to put anything in Dee's file after the findings of this report?

A.   No.

Q.   Okay.   None of the behavior acknowledged by Dee in this report would qualify or require any kind of a note in his file?

A.   No.

Q.   Okay.   What about, let's see, page 7 says, "Some of Lindsey Yeaman's co-workers thought she was picked on as well.   Some base this on the dress standards for Lindsey Yeaman that were different from other workers in the department."

Do you feel that that was appropriate to have different dress standards for Lindsey than other in the department?

might cause concern.  Okay.  It looks like there is potential gender bias in the wastewater department.  He spoke with Chelsey Ferrin; am I correct that she was the only other female co-worker --

MR. ANGELL:  Hang on.  Object to the form.

MS. ANDERSEN:  Sure.

MR. ANGELL:  Counsel, you like to summarize and editorialize what's in that report and then ask a question.

MS. ANDERSEN:  Okay.  We'll read it.  I'll quote.

BY MS. ANDERSEN:

Q.  So we'll start all the way back; I'll read the second paragraph.

"Additionally, the investigation notes for information purposes only, some additional areas of concern, that may reflect potential gender bias in the Wastewater Department."

Okay.

Below that it says, "It was reported, primarily by Chelsey Ferrin, during the investigation, that there seems to be different rules of conduct for male and female workers in the department.  The differences are of the following nature."

And I'll pause there and ask, are you aware of which employees of the wastewater department were female?  Do you recall which employees of the wastewater department are female at this time?

A.  Chelsey and Lindsey.

Q.  Were there any others who were female?

A.  Don't remember.

Q.  Okay.  All right.

Bullet one, "Requests for leave, particularly sick leave, are usually accepted without much explanation for male workers, whereas the female workers report that they will have to make more detailed statement of the nature of why they need to use sick leave, including intimate details that make them uncomfortable."

Do you recall reading that paragraph?

A.  When the addendum came in, yes.

Q.  Did it come in at a separate time than the rest of the report?

A.  I don't remember.  I think it came in after the report, but I don't remember.

Q.  Okay.  We can check with Carol.  Did you take any action based on that statement?

A.  No.

Q.  Did you have any concerns that women were

being treated in the wastewater department based --

A.   Yes.

Q.   Okay.  What did you do with those concerns?

A.   I did nothing with them.  I didn't think it was of substantial enough detail to make any changes.

Q.   Okay.  So were you comfortable with women being asked intimate details about their need for sick leave?

A.   That's the one that probably concerned me the most.

Q.   Did you take in action?

A.   I did not.

Q.   Okay.  Bullet point two, the second one, "When there are departmental celebrations, i.e., birthdays, a female co-worker was told to cut the cake and serve it, as well as to wash the dishes, etc., feeling that such requests were made because she was a female, not a male employee.  The female declined to perform such 'chores' and did not feel any retribution or adverse employment impact from the declination."

Did you have any concerns based on that paragraph?

A.   No.

Q.   Okay.  Are you comfortable with the women being the ones to be asked to cut and serve the cake?

A.   No, but I didn't have any concerns over it, either.

Q.   Okay.  So no action was taken based on that?

A.   Right.

Q.   And to your knowledge, no note was made in Dee Hodge's employee file over any of the findings of Kerry McMurray?

A.   No.

Q.   Okay.

MS. ANDERSEN:  All right.  Let's go to -- are we on 10?

(Exhibit 10 marked for identification.)

BY MS. ANDERSEN:

Q.   Okay.  I'll let you take a look at Exhibit 10. Have you seen that before?

A.   No, I don't believe I have.

Q.   Do you understand what that list is?

A.   Not really.

Q.   Okay.  Maybe we can help and I can follow up with Carol.  On the top left of the first page it says, "Violations of Rules."  So I was wondering if this might be a list of employees who had violated the rules.  Do you have any insight of whether or not that's correct?

Q. So you recall you and Carol going to Dan's home with the notice of proposed termination?

A. Yes. I know we tried to serve it there a couple times, you know. I don't remember if -- if that's how it was actually done, but I know we tried to serve it there a couple of times.

Q. Okay. So let's back up a bit to February 18th. We've talked about that date quite a bit. Do you recall whether Dan finished that day out at work or if he left earlier?

A. I don't recall.

Q. Do you recall asking Dan to leave the workplace?

A. I don't know what day it was, but Sheriff Warrell and I went out there and spoke to Dan based on the threats of violence. I told him he was to leave the wastewater plant and not to return; if he returned, would be considered trespassing.

Q. Okay. Told to leave the wastewater plant, not return or it would be trespass. Do you recall saying, "criminal trespass"?

A. I don't know the difference. I just said he'd be charged with trespassing.

Q. Okay. Did you say the wastewater plant; did you include all City property in that?

A.  I might have.  I don't recall.

Q.  Okay.  All right.  Did the sheriff say anything?

A.  No, not that I remember.

Q.  Who made the decision to have the sheriff present?

A.  I did.

Q.  Okay.  And that was based on?

A.  Based on having another witness and in case the trespassing had to be enforced.

Q.  Okay.  Meaning, you were concerned that Dan wouldn't leave when he was told to leave?

A.  No.

Q.  Oh, explain, please.

A.  He'd been put on administrative leave before and left, and I didn't think there was any reason that he wouldn't leave when I asked him to.

Q.  But you brought the sheriff with you to tell him to leave?

A.  As a witness, yes.

Q.  Okay.  Do you have --

A.  The sheriff didn't tell him to leave; I told him to leave.

Q.  Do you ever use Carol Anderson as a witness when you --

A.   Sometimes, yes.

Q.   Was there a reason to choose the sheriff over Carol that day?

A.   Just because of the threat of violence.

Q.   Do you recall, prior to coming to Dan with the sheriff, whether you ever asked him about whether he had made these threats?

A.   No.

Q.   You don't recall if you spoke before?

A.   No.

Q.   Okay.  Do you recall whether Dan had a chance to collect his belongings when you came with the sheriff?

A.   I don't know.

Q.   Was it possible that Dan was told to leave immediately?

A.   I asked him to leave.  I don't know how immediate that was.

Q.   Do you know whether Dan ever had a chance to retrieve his personal property from City property?

A.   I don't know.

Q.   Do you recall reading the Human Rights Commission complaint that Dan filed against the City?

A.   Yeah.

Q.   Do you recall that mentioning that he had

$2,000 worth of personal property that he was not allowed to retrieve?

A. I don't remember that.

Q. Okay. You have no recollection of Dan ever asking for his personal property back?

A. I don't think we have had that conversation, no.

Q. Okay.

A. He may have asked someone else, but I don't remember a conversation with him.

Q. Does the City mark its tools in a special way?

A. Depends on the department. Some have department tools, some have personal tools in the department, just depends on the department.

Q. Let's say wastewater department.

A. I don't know how they took care of their inventory of tools.

Q. Was any effort ever made to determine whether any of Dan's tools were in with the wastewater department?

A. I'm not aware of any.

Q. Okay. Who would be aware of any effort?

A. I don't know.

Q. Okay. Do you know if anyone followed up on Dan's complaint to the Human Rights Commission about not

REPORTER'S CERTIFICATE

I, GRETCHEN SISK, CSR No. 1125, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony and all objections made were recorded stenographically by me and transcribed by me or under my direction;

That the foregoing is a true and correct record of all testimony given, to the best of my ability;

I further certify that I am not a relative or employee of any attorney or party, nor am I financially interested in the action.

IN WITNESS WHEREOF, I set my hand and seal this 12th day of September, 2022.


_____

GRETCHEN SISK, CSR, RPR

Notary Public

P.O. Box 2636

Boise, Idaho  83701-2636

My commission expires January 24, 2026

# EXHIBIT B

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


OTTIS D. PHERIGO, an individual,) Case No. 4:21-cv-364

                Plaintiff,     )

vs.                          )

CITY OF BURLEY, an Idaho      )

municipal corporation,        )

                Defendant.    )

_____)


DEPOSITION OF DEE HODGE

AUGUST 29, 2022


REPORTED BY:

GRETCHEN SISK, CSR NO. 1125

NOTARY PUBLIC

BY MS. ANDERSEN:

Q.  Okay.

A.  -- things.  And also I remember another situation where another employee was going to hit another employee with a shovel.

Q.  Okay.  And how was the employee shovel incident handled?

A.  I got it under control and had -- had a verbal discussion with both of the employees.

Q.  Okay.  Going back to our list in the employee manual, wasn't -- did anybody have a reprimand written up --

A.  I --

Q.  -- or were they dismissed?

A.  I believe so.  I think Rusty --

MR. ANGELL:  Again, trying not to use names, there.

THE WITNESS:  Yes.

BY MS. ANDERSEN:

Q.  The individual had a written reprimand for that?

A.  Yes.

Q.  Do you recall the year?

A.  No.

A.   Yes.

Q.   Okay.  Does that look like an accurate copy of that statement that you made?

A.   Yeah.

Q.   Okay.  Do you recall the circumstances of making this statement?

A.   Yeah.  Like we were just talking with this, this is the one after he had warned others to stay away and that he had threatened to kill me.

Q.   Okay.  So --

A.   When I asked those guys to go up to City Hall and tell them what he said.

Q.   Okay.  So February 18th, so looks like that same day we have this -- I'll call it a disagreement with Dan.  So two of you disagreed.  After that, you wrote this note.  And do you remember who you gave it to, this?

A.   Probably Carol.

Q.   Okay.  So you gave this to Carol and you said you asked the other co-workers in your department to also go to Carol?

A.   Right.

Q.   Are you aware if they ever went to Carol previously with any concerns?

A.   I wasn't.

A.  I'm just --

Q.  I'll just tell you, I'm trying to get a timeline going, so I'm kind of interested in timing.  So any insight into the timing would be helpful.

A.  I think that some of these threats came right after --

Q.  Okay.

A.  -- she had that letter.

Q.  Okay.  All right.  And did some come later, is that --

A.  I don't --

Q.  -- don't recall?

A.  They were made to other people, they weren't made to me, so...

Q.  Did any of your -- employees in the department come to you can with concern about the threats prior to February 18th?

A.  They warned me, yes.

Q.  In -- prior to this date?

A.  I don't recall the dates.

Q.  Okay.  All right.  So that's one of the statements.  And let's go to Number 4.  It says, statement by Rusty Blackner, and it has a date of 2/18/20, which I think would be consistent with you saying you asked Rusty to go tell Carol, I guess, what

Q.   Okay.  All right.  Okay.  So February 18th, it would be, when you spoke with Mark Mitton with concerns?

A.   I don't remember the dates.

Q.   Do you remember if it was prior to the time when you and Dan had that negative interaction on February 18th?

A.   All this, in my mind right now, seems like it all happened within days, so --

Q.   Okay.

A.   -- I just don't remember any timelines.

Q.   Okay.  But it sounds like the first time they've ever, of bringing it to Carol or Dan's attention, was that day of the conflict with Dan?

MR. ANGELL:  Object to the form.  I think he's answered that, but go ahead.

MS. ANDERSEN:  Okay.  We'll just move on.

BY MS. ANDERSEN:

Q.   Okay.  Number 6, Dustin Raney's statement, it's also just a one page.  Did you find it?  Okay.  Did you recall asking Dustin Raney to make a statement to give to Carol?

A.   I -- yes.

Q.   Okay.  Do you recall seeing the statement before Dustin gave it to Carol?

Q.  -- Dustin?  Okay.  All right.  And it says, "The next morning, I told Dee what Dan had said about the others concerns and we went to city hall and discussed the matter with Carol Anderson and Mark Mitton."

So this would place it the day after February 3rd.  I'm going to say is February 4th.  Do you recall going with, let's see, it would be Dustin, to City Hall to talk to Carol and Mark about Dan, early February?

A.  I don't recall.

Q.  Do you recall whether a reprimand was ever discussed at that time?

A.  I don't remember.

Okay.  And this is saying -- okay, I'll just keep going -- "Mark told us that he doesn't believe Dan meant anything about his statements being of a physical nature.  He," I think that means Mark, you can correct me if you think otherwise, has -- "he also informed us that Dan had filed a sexual harassment complaint against Dee and that we would both be being contacted by the County Administrator, who would be conducting an investigation, for questioning."

So it looks like Dustin is saying that he went with you to speak with Carol and Mark on February 4th,

and then that's when you found out about the sexual harassment allegation.  Does that match with your memory of the events?

A.  It probably happened like that.

Q.  Okay.  That would be well before the February 18th disagreement with Dan.  Does that timing seem accurate to you?

A.  Yes.

Q.  Okay.  Then it says, on the morning of -- this is -- I'll just -- I'll read it all.  "I was contacted by the County Administrator at 3:00 pm on" February 4th, 2020 "and was asked to come to his office to discuss the complaint and I went up and did a recorded interview with him.  On the morning of" February 5th 2020 "I was informed by Dee that Dan had" been "sent home on administrative leave until these matters had been resolved."

Does that -- do you recall telling Dustin that, that Dan was -- this would be early February -- that Dan was placed on administrative leave until the matters were resolved?

A.  Yes.

Q.  Okay.  That would have been before your interaction with Dan.  Do you recall him being on leave before your interaction on the 18th?

A.   Never.

Q.   Never?

A.   I don't believe I've ever seen them, no.

Q.   No one gave you, like, a written report?

A.   No.

Q.   Did anyone verbally tell you what had happened as a result of that investigation?

A.   Yeah, I believe they did.

Q.   Okay.  Who verbally told you?

A.   Mark Mitton.

Q.   Okay.  But you never got a physical copy of the report?

A.   I didn't.

MS. ANDERSEN:  Do you have any object to me showing him a copy of the report?

BY MS. ANDERSEN:

Q.   Okay.  Number 9, that is a copy that we received from the City of Burley of the report that was done by Kerry McMurray.

A.   Okay.

Q.   So does that not look familiar to you?

A.   No.

Q.   Okay.  Did you understand it to be your right, under the employee handbook, to get a copy of a written

report of the investigation?

A.   No.

Q.   Were you concerned that you hadn't received a copy of the report?

A.   No.

Q.   Okay.  I'll give you a second to take a look at that.

MR. ANGELL:  Did you say that was 9?

MS. ANDERSEN:  Yeah, that's Exhibit 9.

MR. ANGELL:  Do you want him to look at anything specific?  It's 10 pages long.

MS. ANDERSEN:  Okay.  Yeah, we'll get to specific things.

BY MS. ANDERSEN:

Q.   Okay.  Let's go to the -- let's skip back to the employee manual, just for a second, page 75 of that thick employee manual, Exhibit 1.  Okay.  Number 8 says, "Within five (5) days after the investigation is concluded, the City Administrator will meet with the complainant..." I think the person who made the report, "and the respondent..." which I take to mean the accused, "separately in order to notify them in person of the findings of the investigation and to inform them of the action being recommended by the City

A.    I'd given -- the cup was actually Chelsey's.

Q.    Okay.  Did you tell Chelsey that you'd been told by Mark that it was not appropriate for the office?

A.    No.

Q.    Okay.  So you didn't take any actions after --

A.    I didn't.

Q.    -- being told about the coffee cup?

A.    He didn't tell me to remove it, he told me not to bring things on the premises like that anymore.

Q.    So basically, no more coffee cups like that?

A.    Correct.

Q.    But nothing --

A.    At that point, I don't even know if the coffee cup was there.

Q.    So it was more, don't do stuff like that in the future?

A.    Yes.

Q.    Okay.  All right.  Do you recall ever being spoken to specifically prior to this sexual harassment report about how you were treating Lindsey, or concerns about how you were treating Lindsey?

A.    No.

Q.    Okay.  All right.  So let's go to page 5, because that's where the specific allegations of Lindsey's are made.  Number one talks about a reference

the sick leave, such as whether it would be appropriate for her to take sick leave to care for her son?

A.  I remember the conversation with her, yes.

Q.  Okay.  Could you tell me about that?

A.  By asking her if she was going to take care of her son, and he's a family member, and it's allowable in the employee handbook.

Q.  So you don't recall criticizing her --

A.  No.

Q.  -- for taking leave for her son?

A.  No.

Q.  Okay.  Were you aware that some of Lindsey Yeaman's co-workers thought she was picked on?

A.  No.

Q.  No one addressed that with you?  Mark or Carol never addressed that with you; would that be accurate?

A.  Yes.

Q.  Okay.  All right.  Let's skip forward.

Oh, I'll ask -- pull out your -- Exhibit number 10, and I don't know if you'll be able to help me with this or not.  Have you seen this before, this spreadsheet?

A.  I haven't.

Q.  Okay.  Do you have any insight into what it means?  I can tell you that it says, "Violation of

meaning he meets expectations for how he interacts with his co-workers.  I'm just wondering if you feel that that's consistent?

A.  This isn't saying that he was -- how he was acting when he was called in at night.

Q.  So the --

A.  He worked with his co-workers eight hours a day, five days a week.

Q.  So this is not referring to how he interacts with co-workers --

A.  Obviously, during this evaluation he must have been doing fairly well because he got a change in status.

Q.  Okay.

A.  Which moved him from being maintenance technician to a computer programmer.

Q.  Okay.  Let's look at the second page of this.  So the Supervisor Assigned Goals, would that be fair to say those are the goals that you gave to Dan?

A.  Yes.

Q.  Okay.  The first goal, "Work hard to be healthy and get some time built up."  Can you explain that one to me?

A.  It means that he had been ill and he probably used up all of his vacation and sick leave.

Q.   Do you know what he was ill with?

A.   He's had several illnesses over the years.

Q.   Do you know any of them?

A.   He has had shoulder issues, he's had knee issues, and severe allergies.

Q.   Okay.  So did you feel that there was work that he could do to prevent those allergies and knee issues?  I guess I need help with understanding what kind of work he would do to be healthier since this is his goal that he's assigned to do.

A.   I -- I don't know what he can do about it.

Q.   But that was your goal for Dan, your supervisor assigned goal?

A.   I wanted him to get healthy, yes.

Q.   Okay.  And you felt that that was within his control?

A.   It was better than giving him a goal that he couldn't meet.

Q.   So you felt that he could meet the goal to get healthy?

A.   With that and building up some time, yes.

Q.   Would it be fair to say that the time wasn't getting built up because he wasn't healthy?  Would that be accurate?

A.   Yes, if that's what his timesheet says, that

REPORTER'S CERTIFICATE

I, GRETCHEN SISK, CSR No. 1125, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony and all objections made were recorded stenographically by me and transcribed by me or under my direction;

That the foregoing is a true and correct record of all testimony given, to the best of my ability;

I further certify that I am not a relative or employee of any attorney or party, nor am I financially interested in the action.

IN WITNESS WHEREOF, I set my hand and seal this 9th day of September, 2022.

_____

GRETCHEN SISK, CSR, RPR

Notary Public

P.O. Box 2636

Boise, Idaho  83701-2636

My commission expires January 24, 2026

# EXHIBIT C

UNITES STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

OTTIS D. PHERIGO, an individual,  )

                    Plaintiff,        )

                    vs.               ) Case No. 4:21-cv-364

CITY OF BURLEY, an Idaho              )

municipal corporation,                )

                    Defendant.        )

_____)


DEPOSITION OF DUSTIN JAMES RANEY

TAKEN SEPTEMBER 12, 2022

IN BURLEY, IDAHO

Q.  Would it be fair to say sometimes he told you no?

A.  Yeah.

Q.  Okay.  All right.  So when you started in 2017, Jean Gorringe was the pretreatment coordinator --

A.  Correct.

Q.  -- is that correct?

So in your job as lead, did you interact with the pretreatment at all?

A.  Yes.

Q.  What was the nature of that interaction?

A.  Work-related.  I was just kind of a -- I was learning pretreatment myself at the time.  I didn't know very much about it.  And Dee wanted me to be somewhat involved in it and try and learn the processes and what all was required by permit.

Q.  So why did -- was knowing pretreatment important for being a lead?  Was that an important skill?

A.  Not necessarily for a lead.  For a director, absolutely.

Q.  Okay.  So for your job, though, as Class 4 lead, when you were the director, that was necessary to understand pretreatment?  Would that be accurate to say?

A.  As what was?

REPORTER'S CERTIFICATE

I, JAHNENE ADMIRE, CSR No. 760, Certified Shorthand Reporter, certify:  That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony and all objections made were recorded stenographically by me and transcribed by me or under my direction;

That the foregoing is a true and correct record of all testimony given, to the best of my ability;

I further certify that I am not a relative or employee of any attorney or party, nor am I financially interested in the action.

IN WITNESS WHEREOF, I set my hand and seal this 21st day of September, 2022.

_____

JAHNENE ADMIRE, CSR 760, RPR

Notary Public

P.O. Box 2636

Boise, Idaho  83701-2636

My commission expires May 04, 2024

# EXHIBIT D

**DECLARATION OF COUNSEL KELLY ANDERSEN, IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT [DKT.20] – EXHIBIT D**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

OTTIS D. PHERIGO, an individual,  )

                    Plaintiff,        )

                    vs.               ) Case No. 4:21-cv-364

CITY OF BURLEY, an Idaho          )

municipal corporation,            )

                    Defendant.        )

_____)

DEPOSITION OF CAROL ANDERSON

TAKEN SEPTEMBER 12, 2022

IN BURLEY, IDAHO

you know -- they were concerned about their safety and, you know, reported that they felt unsafe.  And so Mark at that point, you know, put -- you know, did the termination.

Q.  Do you know whether he consulted with Dee Hodge at all, department head, in making that decision?

A.  I don't recall.  I don't know if he did or not.  He didn't do it in a meeting with me.

Q.  Okay.  That's fair.

So I want to talk about the discrimination/harassment policy.  Are you familiar with the sexual harassment policy of the City?

A.  Yes.

Q.  Did you consult that when Lindsey came -- let's start do you recall Lindsey coming in to speak to you January 6th of 2020 regarding behavior of Dee Hodge?

A.  I recall Lindsey coming in and speaking to me in January, yes.

Q.  Okay.  Did you take notes of that?

A.  Yes, I did.

Q.  Were they handwritten notes?

A.  They were handwritten notes.

Q.  Okay.  All right.  Wait a minute on that.

Okay.  Did you ask Lindsey to make any kind of written statement at that time?

A.  I don't recall asking her to write anything down, no.

Q.  Okay.  Did you consider that complaint by Lindsey on January 6th, 2020, to be sexual harassment?

A.  No, I did not.

Q.  What about complaint about harassment?

A.  No.

Q.  Okay.  Do you recall Lindsey ever using the word "harassment"?

A.  I do not recall her using the word "harassment."

Q.  Or "bullying"?

A.  She did use the word "bullying," yes.

(Mr. Pherigo left the room.)

Q.  (BY MR. ANDERSEN)  All right.  And I think -- I don't believe -- let's see.

So did you have any concerns after Lindsey spoke with you January 6th, 2020, about the behavior that she reported?

A.  Yes, I did.

Q.  What were the concerns that you had?

A.  I don't remember specifically, but, you know, I know that I went and got Mark, actually, when we were talking and -- just because I was a little concerned at the time, and had Mark come in and listen to what she

have a job."

What do you understand that to mean?

A. Well, I think that she thought he didn't want her to have the job. I mean, I just take it for what she said.

Q. Okay. She talked about not being able to leave the building, it looks like. Okay. Going down below, the paragraph in the middle-ish, "When Lindsey asked to have a day off to care for her disabled son, Dee said "Your son is not 2, why do you need to go, he is big.'"

What did you think of that statement?

A. Well, it seemed a little harsh.

Q. Next paragraph, "I asked Lindsey what she would like to see and she said that Dee needs to stop harassment of her. She can't do anything right and gets no help."

So, I guess, looking at that, do you recall her using the word "harassment"?

A. I didn't, but, obviously, she did.

Q. Are you aware of whether your discrimination and harassment policy is only for sexual harassment, or is it for harassment and specifically sexual harassment?

A. It covers both.

Q. Okay. All right. "Dustin told her I'm not

Do you know if Lindsey told Mark just what she had told you, or was she able to add anything more to Mark than what she had said to you?

A. I don't know. I don't remember.

Q. Okay. "He wrote notes and then told Lindsey he would speak to Dee and Dustin."

Okay. We'll follow to the next page. Okay. "Mark then had me call Dee and Dustin. He had them come into the office."

Do you recall if Dee and Dustin were called into the office together?

A. I believe they were.

Q. And who made the decision that they be in the office together?

A. Mark.

Q. Okay. And did you feel that it was appropriate to have Dee and Dustin in the office at the same time?

A. Did I feel it was appropriate to have Dee and Dustin in at the same time?

Q. Yeah.

A. I -- yeah.

Q. Okay. So you were asking -- did you ask Dustin about Dee's behavior in front of Dee?

A. Did I ask -- ask the question again, I'm

sorry.

Q.  Did you -- at this time did you ask Dustin any questions about Dee's behavior while Dee was there?

A.  I did not.

Q.  Did Mark ask Dustin any questions about Dee's behavior when Dee was there?

A.  I'm sorry, ask the question.

Q.  Did Mark ask Dee -- I'm sorry -- did Mark ask Dustin any questions about Dee's behavior when Dee was there next to Dustin?

A.  No.

Q.  So no questions were asked of Dustin at that time?

A.  Not that I recall.

Q.  By either you or Mark?

A.  I don't recall.

Q.  Do you know why Dustin would have been brought in if no questions were asked of him?  What would be the purpose of bringing in Dustin?

A.  Well, because I believe that was the time when Mark told Dustin that he wanted Dustin to now supervise Lindsey.

Q.  Okay.  But before, it says, towards the bottom of the page, "Dustin told her 'I'm not your supervisor anymore, because I'm too nice to you.'"

So I guess I'm trying to match that up with Dustin being told he would be her supervisor.  Do you know if he became her supervisor and then wasn't and then became her supervisor again?

A.  Well, this is what Lindsey reported that Dustin said.  So I don't know that Dustin was ever not her supervisor.  But this is what she said that Dustin said.

Q.  Okay.  Did you consider Dee to be her supervisor, as well?

A.  Well, Dee was over the whole department.  So, yes, he would have -- he would have been her supervisor.  And we have -- that happens in the City, where we have like kind of a second in command.  But we always recognize the department head as the supervisor.

Q.  Okay.  So was Dee being called in at this time because he was department head or some of his behavior had been criticized?

A.  He was called in because he was department head --

Q.  Okay.

A.  -- is my assumption.  I mean, it was not stated.

Q.  Okay.  Going in that same second page, "Dee came in and later expressed frustration.  He said that

it lowers morale for him to not speak to Lindsey."

Was that to you that he came in later to express frustration?

A.  Yes.

Q.  Do you know how much later that was?

A.  I don't remember.

Q.  Whether it was the same day or a different day?

A.  I think it's the same day because it's in my notes, but I don't remember.

Q.  Okay.  And do you recall how you responded to Dee when he said it lowers his morale to not speak to Lindsey?

A.  I don't recall.

Q.  Okay.  Looks like -- says, "I asked Dee if we should get some clarification from Mark.  He said no, that he was just frustrated.  He didn't want to bother Mark before he went on vacation."

Did Mark go on vacation shortly after this?

A.  He did.

Q.  Do you know how soon after?

A.  I don't.

Q.  I notice there's a report from January 8th, 2020, is that connected at all to the January 6th report?  Is there a reason why they're in the same

writing?  Is that your understanding?

A.  Ask the question again, please.

Q.  If someone makes a complaint about harassment or sexual harassment, is there something that needs to be put into writing by the person making the complaint?

A.  Not necessarily.

Q.  Okay.  Okay.  Do you know if the handbook requires that, something in writing if there's a complaint?

A.  I don't know off the top of my head.  I'd have to look.

Q.  Did you -- after Ms. Yeaman came in to speak with you, did you go back and consult the policy?

A.  No, I did not.

Q.  How often do you consult the policy?

A.  Pretty regularly.

MS. ANDERSEN:  Okay.  I'm going to go ahead and introduce this exhibit.

(Exhibit 10 marked.)

Q.  (BY MS. ANDERSEN)  I'm going to give this to you.  It might be easier to talk about if you have a chance to look at it.  This is the one that I was given which appears to have an adopted November of 2018 with an FMLA revision of June of 2020.  Okay?

Have you seen this before?

A.   Yes.

(Mr. Pherigo left the room.)

Q.   (BY MS. ANDERSEN)   Okay.   So I'm interested in the section about harassment and sexual harassment, okay, on page 74 -- actually, one more page over, 75. Okay.   Top of page 75, the first paragraph, I'll just read a part of it, "A person who feels harassed, discriminated, or retaliated against may initiate the complaint process by filing a written and signed complaint with the city administrator, city clerk, department head, or human resource analyst.   No formal action will be taken against any person under this policy unless a written and signed complaint is on file," and it goes on.

Are you aware of that policy, that it should be in writing, a complaint should be in writing before it's investigated?

A.   No.   I was -- I mean, no.   I -- I mean, obviously, it's in there.

(Mr. Pherigo entered the room.)

Q.   (BY MS. ANDERSEN)   But you don't recall offering Ms. Yeaman to put her complaint in writing?

A.   No, I don't.

Q.   Asking her to put it in writing?

A.   I don't remember asking her to do that.

Q.   Do you recall asking Dan to put his complaint into writing when he made a complaint?

A.   I don't remember asking that, no.

Q.   Okay.  All right.  Are you familiar with the rest of the process in the handbook of how to handle -- did you consult the handbook when Dan made his complaint on February 3rd?

A.   No.

Q.   All right.

A.   Quite honestly -- no, I did not.

Q.   Okay.  I guess since we're here, do you know the time period for investigating a sexual harassment complaint?  My understanding is page 75, paragraph 5 talks about the time frame.

A.   Mm-hmm.

Q.   Do you recall what the time frame is?

A.   Well, it says here five working days.

Q.   Five working days to notify the person of the charge and initiate an investigation.  I was looking further below of paragraph 5.

A.   I'm sorry, I don't know where you're looking at.

Q.   On page 75, paragraph 5 -- I can read it -- "Within 15 business days of the complaint being filed or the matter being referred to the city administrator, the

city administrator or other person conducting the investigation will conclude the investigation and submit a report of his or her findings to the City."

A. Okay.

Q. So do you understand how much time is given for the investigation once the city administrator is notified?

A. Well, it looks like it would be -- it would be within 15 business days.

Q. 15 business days, okay. Thank you.

MS. ANDERSEN: Got another one.

(Exhibit 11 marked.)

MS. ANDERSEN: And, Sam, this was previously Exhibit 10. This is one that we talked about before.

MR. ANGELL: Yeah, we wondered what -- hang on.

MS. ANDERSEN: It was an Exhibit 10 in a prior deposition.

MR. ANGELL: You can just keep talking. I'll find it.

Q. (BY MS. ANDERSEN) Have you seen this before?

A. I'm not sure.

Q. All I can tell you is with this stamp in the bottom corner, BURLEY and 50, this is something that we -- I, as the plaintiff, received from the City of

Q.  Different sets of rules?

A.  No.

Q.  Okay.

(Exhibit 12 marked.)

Q.  (BY MS. ANDERSEN)  Have you seen that before?

A.  Yes.

Q.  Okay.  Did you have any part in writing it?

A.  Yes.

Q.  Okay.  Did you write that?

A.  I probably started the letter and then passed it on to the city attorney, who probably made changes, and Mark probably also made changes, but I probably started the letter.

Q.  Maybe an earlier draft?

A.  Yes.

Q.  Do you recall the context of this letter, what circumstances caused this letter to be written?

A.  I -- yes.  I mean, vaguely I remember.

Q.  What do you remember?

A.  That Dan had been kind of a no-show, no work for several days in a row and -- and according to our policy, you know, at that point if you did -- you were a no-show, then you were terminated.  But, you know, we -- we felt that we needed to -- we talked to the city attorney, and he said, well, maybe we need to look into

that that's not how the process works?

A.   Well, again, the personnel policy said that a no-show, no work, you know, was grounds for termination. So I think he felt -- I mean . . .

Q.   You don't have to say what Dee knew.

A.   Yeah, I -- I'm kind of out there on a ledge a little bit.

Q.   We can move on, that's fine.

So do you recall any -- before -- I'll start again.

Do you recall Dee consulting with you or Mark Mitton before telling Dan that he was terminated?

A.   Yes.  He -- you know, he did come in and talk to -- I know we had conversations about it.

Q.   Okay.

A.   But I don't remember the details of those conversations.

Q.   Do you recall any advice you might have given him about termination of Dan?

A.   Well, you know, I agreed with him that the policy -- that's what the policy was, but I don't recall giving him any advice, no.

Q.   Okay.  All right.  Were you confident that Dee would work with Dan if Dan needed more leave, that Dee could have appropriately worked with Dan?

A.  Yes.

Q.  Okay.

(Exhibit 13 marked.)

Q.  (BY MS. ANDERSEN)  Okay.  Do you recall seeing this before, Exhibit 13?

A.  Yes, I recall this.

Q.  Okay.  Do you recall when you made this statement?

A.  Do I recall when I made the statement?

Q.  This -- or signed this statement.  It just says, "Statement of Carol Anderson."

A.  May 21st of 2021.

Q.  Do you recall why you chose to document this at that time?

A.  I don't remember it.  I don't know why I did.

Q.  Is it your practice if there's a decision that's -- or plan made to fire an employee, do you put any kind of documentation in their file at that time?

A.  I'm sorry?

Q.  If a department head comes to you and says "I feel that I need to terminate an employee," do you, as human resources, make any kind of note in that employee's files?

A.  No.

Q.  That's not your practice.

before?  It's okay if you haven't.  I'm just curious if you have seen it.

A.  I haven't seen this.

Q.  Okay.  I'm interested in that second paragraph.  He says, "Dee continued to document the nonperformance until November of 2019."

Do you have any knowledge of any documentation that Dee made of Lindsey's nonperformance, I guess, until her -- until 2019 of November or before that?

A.  I do not have knowledge of that.

Q.  Did he give you any documentation for her employee file regarding this nonperformance?

A.  He did not.

Q.  Okay.  Okay.  Moving on.  So is it fair to say that Dee was not put on leave at any time after -- regarding the complaints that Lindsey made about him on January 6th, 2020?

A.  Dee was not put on leave, no.

Q.  Did you follow up with Lindsey in any way after January 6th, 2020, about the things that she had complained about?

A.  No.

Q.  Do you know if anyone followed up with Lindsey about the things she had complained about on January 6th?

A.   I don't recall.  I don't know.

Q.   Okay.  Would anyone have the responsibility to follow up with Lindsey based on those -- what she told you, is what you feel should have followed up with her?

A.   I probably should have.

Q.   Okay.  Okay.  Let's move to February 10th.

(Exhibit 15 marked.)

Q.   (BY MS. ANDERSEN)  I'll represent that this was given to me by the City of Burley, and appears to be notes from a hearing on Lindsey Yeaman's termination on February 10th, 2020.  Were you present at that time?

A.   Yes.

Q.   Do you recall if these are your notes or if these are Mark Mitton's notes?

A.   These are my notes.  Mark Mitton was not in the meeting.

Q.   Okay.  Did you have any concerns about Dee Hodge being at Lindsey's termination hearing given her report to you in January?

A.   No.

Q.   Do you believe that Dee Hodge could be objective in reporting -- in evaluating Lindsey's behavior?

A.   I felt he could, yes.

Q.   How much was Dee told about what Lindsey said

A.   Well, Lindsey was there -- quite honestly, I knew when Lindsey was in my office that Mark was just across the hall.  I knew he was there, and so I went and got him.  On the day that Dan was there, I don't remember the details, but Mark was not just across the hall.

Q.   Okay.  Whether he was out of the office or --

A.   I don't know where he was at the time.

Q.   Okay.  Would he have been on vacation at that time?

A.   I don't recall.

Q.   Okay.  So you took some kind of notes somewhere about it?

A.   I believe I did.

Q.   Do you recall -- what do you recall -- I don't have any notes -- so do you recall anything of what he said to you that day?

A.   I don't.  I mean, other than I know that he said that it was -- he said that Lindsey was sexually harassed, but I don't -- I honestly don't remember any of the details.

Q.   Do you recall that he had details, or was it just kind of a one sentence statement that she'd been harassed?

A.   I don't remember details, no.

Q.  Do you remember that there were details given?

A.  I don't remember details given, no.

Q.  Just a statement that she'd been harassed?

A.  That's what I -- I mean, I don't remember.

Q.  Do you recall if you asked any follow-up questions?

A.  I don't remember that either.

Q.  Do you recall whether there was a decision to investigate it?

A.  Yes, there was a decision to investigate it.

Q.  And do you know why the decision was made to investigate Dan's complaint but not Lindsey's complaint?

A.  Do I know why?

Q.  Why there was a decision to investigate Dan's complaint but not Lindsey's complaint.

A.  Well, because Dan's complaint was -- I mean, it was -- it was about sexual harassment, and so there was a reason to investigate.

Q.  Are there -- is there any behavior short of sexual harassment that you think should also be investigated?

A.  Well, yes, there's other reasons to investigate.

Q.  But nothing that Lindsey reported on January 6th to you?

A.   This was the first time we brought in a third party.

Q.   Okay.  So for other issues maybe less important, you would still do something -- make some kind of effort to find out?

A.   Yes, we would.

Q.   Maybe to verify whether the complaint had any foundation?

A.   Yes.

Q.   Talk to the people involved?

A.   Yes.

Q.   Okay.  So who made the decision that Dan's complaint was something that needed to be investigated by a third party?

A.   That would have been Mark Mitton and the city attorney.

Q.   Okay.  So you informed Mark Mitton, and then they decided, yes, this needs to be investigated?

A.   Yes.

Q.   Did you recall ever giving the city attorney or -- Kerry McMurray; is that correct?

A.   Kerry McMurray is not a city attorney.

Q.   Okay.  Who investigated it?

A.   Kerry McMurray.

Q.   Okay.  Do you recall giving Kerry McMurray any

decision -- you believe it's important to have the results prior?

A.  Yes.

Q.  Okay.  Let's look at February 3rd.  That is my -- that is when Dan came in to make a report about sexual harassment of Ms. Yeaman.  It sounds like we don't have notes.

Do you recall any time around that of other coworkers coming in to talk about Dan?  Does that sound familiar at all to you?

A.  I know that other workers came in and talked about Dan, yes.

Q.  Okay.  Do you recall --

A.  Do I know the timeline, not off the top of my head.

Q.  Do you recall Dan being put on leave shortly after his report about sexual harassment?

A.  I know that Dan was put on leave.

Q.  Do you recall why he was put on leave?

A.  Well, he was put on leave twice, and I don't remember -- I honestly don't remember.  I struggle with why he was put on leave at one time.

Q.  Okay.  The first time or the second time?

A.  I get them mixed up, quite honestly, at this point.

kind of the larger paragraph there he talks about coming in to speak to you about Dan's behavior or Dan's threats.  Do you recall that?

A.  Yes, I do.

Q.  Okay.  And you don't recall whether or not the decision to put Dan on leave happened before or after people spoke to you about Dan's behavior?

A.  I -- like I said, I know that Dan was put on leave twice.  And I know that one of those times was definitely because he'd made threats, but I don't remember those time frames.  And I don't remember why we put him on leave, which one came first.  I don't remember.

Q.  Right.  And was there any thought of putting Dee on leave after Yeaman's allegations in January?

A.  No.

Q.  Okay.  No concerns there?

A.  No.

Q.  Okay.  So as we look at this, according to Dustin's statement, he talks about in the third paragraph, on the morning of 2/3/2020, right after work began, he talks about a conversation that he had with Dee; later on, conversations with Rusty and Stormy.  And, basically, they seem to be worried about what Dan might do, is how Dustin characterized it.

A.  Yes.

Q.  Okay.  All right.  So I can go through and cross off a bunch here.  All right.

Were there any concerns that employees could speak up about Dee while he was not on leave regarding the investigation?

A.  I'm sorry?

Q.  Did you have any concerns that employees would not be able to speak candidly about Dee Hodge about the investigation if he was not placed on leave?

A.  I did not have concerns about that.

Q.  Okay.  Was there anyone who would have been qualified to be present to take over Dee's responsibilities if a decision had been made to put Dee on leave?

A.  I believe so.

Q.  Okay.  Do you recall ever discussing whether or not Dee should be placed on leave either after Lindsey's or Dan's reports?

A.  I don't recall talking about putting Dee on leave.

Q.  Or even discussing whether or not?

A.  I -- that -- I did not have a discussion.

Q.  Okay.  All right.  Do you recall how it was decided that Dan should return to the office after his

cap at that time because he felt that was
unprofessional.  So he talked to her about that.  And
then he talked to her about getting paperwork done and
that things needed to be done in a timely manner and
that -- I don't remember.  That's basically what I
remember him talking to her about.

Q.  Do you know whether or not Dee allowed Chelsey
to wear a cap on visits or inspections when she was
pretreatment coordinator?

A.  I don't know.

Q.  All right.  And so that bottom paragraph on
page 9, I want to read a bit from that.  "The
investigation also brought forward that Dee Hodge can be
stern, demeaning, even condescending in his managerial
approach to employees."

Do you recall reading that before?

A.  I've read that, yes.

Q.  Okay.  What are your --

A.  Some of this, no.

Q.  But when you got this report?

A.  Yes.

Q.  What are your thoughts on that sentence?

A.  Well, as I said before, I thought that Dee can
be harsh at times, yes.

Q.  Did you feel that he was inappropriately

harsh?

A.   No, I don't -- I don't believe that I thought that.

(Phone interruption.)

THE WITNESS:  Sorry.

Q.   (BY MS. ANDERSEN)  Do you recall having any conversations with Dee after reading this paragraph to discuss this observation by Kerry McMurray?

A.   I don't recall having a conversation with Dee about that.

Q.   Okay.  Do you recall giving Dee a copy of this report?

A.   I don't recall.

Q.   Do you recall giving Dan a copy of this report?

A.   No.  I know I did not give Dan a copy.

Q.   Do you recall if you gave Lindsey a copy of this report?

A.   I don't believe I gave anyone a copy.  I actually talked to our city attorney and asked him who should be given a copy.  And I don't recall giving it to anybody.  I believe that the attorney did that.

Q.   The attorney gave people copies or made the decision not to give copies?

A.   I did not give anybody copies.

Q.   Are you aware whether anyone received copies?

A.   I'm not aware whether they received copies.

Q.   Okay.  Going to page 7, do you recall whether the policy requires the complainant to get a copy of the findings?

A.   It probably does say that they are allowed a copy of the findings.  If my memory serves me right, the policy says that.

Q.   Okay.  So bottom paragraph, page 7, "Some of Lindsey Yeaman's coworkers thought she was picked on, as well.  Some based this on the dress standards for Lindsey that were different from the other workers in the department."

MR. ANGELL:  Are you reading from this?

MS. ANDERSEN:  Page 7, bottom of page 7.  Yes.

MR. ANGELL:  Okay.

MS. ANDERSEN:  I am reading from it.

Q.   (BY MS. ANDERSEN)  Did you find it there?

A.   Yes.

Q.   Okay.  "Some was based upon Dee Hodge's treatment of her with respect to her performing work."

Do you recall reading this before?

A.   I read it when I got the . . .

Q.   Did you have any concerns about the information that I just read to you?

A.   I don't recall being concerned about it.

Q.   About Ms. Yeaman being picked on?

A.   That wasn't my focus when I read the letter, but I wasn't -- I don't recall being concerned about it.

Q.   Okay.  Do you feel it's appropriate for employees to be picked upon?

A.   No, I do not.

Q.   Okay.  Did it matter to you that her coworkers also believed that she was picked on?  Because I know she said she was.  Did it, in your mind, make her allegations more credible that her coworkers also observed that?

A.   I don't recall thinking that.

Q.   All right.  Page 9, addendum to the investigation.  Okay.  And I think we discussed you don't recall who gave the timeline to the investigator of having to be done by February 10th?  You're not aware of how that came about?

A.   I'm not aware.

Q.   Okay.  Okay.  He mentions a report by Chelsey Ferrin, that there seems to be -- it's the third paragraph down -- "It was reported primarily by Chelsey Ferrin during the investigation that there seems be different rules of conduct for male and female workers in the department.  The differences are of following

nature."

At first bullet point, "Request for leave, particularly sick leave, are usually accepted without much explanation for male workers; whereas, the female workers report that they will have to make more detailed statement of a nature of why they need to use sick leave, including intimate details that make them uncomfortable."

Do you recall reading that before?

A.  I read it, yes.

Q.  Do you recall having any concerns after reading that?

A.  I'm sure I was concerned.

Q.  Do you recall doing anything?

A.  No.

Q.  Do you feel it's appropriate for more follow up on sick leave to be given to women than to men?  Do you think that's appropriate behavior, that more questions or more details are asked of women requesting sick leave than men requesting --

A.  I do not think that women should have more details, no.

Q.  Okay.  Do you know if Mark Mitton took any action based on this with Dee Hodge?

A.  I don't know if he did.

know?

A.   Chelsey Ferrin and Lindsey -- well, Lindsey was no longer, I guess.

Q.   But, I guess, participated in the investigation.  I guess there's comments that she's referenced in there.

A.   Okay.  So you're asking me who participated in the investigation?

Q.   Well, yeah, we'll do that.  Which females are you aware that participated?

A.   As far as I know, it was Chelsey and Lindsey.

Q.   And who was employed in the department that was female at the time?

A.   As far as I know, Chelsey and Lindsey.

Q.   Okay.

A.   As far as I recall.

Q.   Okay.  Did it concern you that the only females in the department are the ones that seemed to have expressed the concerns about Dee Hodge's behavior?

A.   I'm sorry, the question again?

Q.   Well, we've talked about concerns raised by Chelsey and then on the other page we talked about concerns raised by Lindsey.

Did that have any significance for you, that the only two female employees in the department were the

ones that raised concerns about Dee's behavior?

A.  It was not concerning to me.  I mean, it was, but.

Q.  Not enough to take any action?

A.  Well, again, I mean, Mark Mitton's the supervisor.  So I -- you know, he's the supervisor of all of us, really.

Q.  Okay.  So if action did need to be taken based on this report, who would be the appropriate person to take that action?

A.  Probably Mark Mitton.

Q.  Okay.  Do you have any knowledge of whether Mark Mitton followed up on anything in this report?

A.  I don't know if Mark Mitton followed up on this report.

Q.  But you're sure that you did not follow up on anything in this report?

A.  I did not.

Q.  Okay.  All right.  Okay.  Let's move on.

(Exhibit 17 marked.)

Q.  (BY MS. ANDERSEN)  Do you recall seeing this before, Exhibit 17?

A.  Yes, I've seen this.

Q.  To your knowledge, what is this that we're looking at?

week?

Q. Yeah.

A. Is that the statement that you're talking about?

Q. Yes.

A. And what is my thoughts on that statement?

Q. Yeah.

A. Well, I think that, you know, he was upset and was hoping that Dan would step down. That's what I thought.

Q. Do you think it went anything beyond hoping that Dan would step down? Say, taking any action?

MR. ANGELL: Object to the form, calls for speculation.

THE WITNESS: I don't think so.

Q. (BY MS. ANDERSEN) You didn't -- at the time do you recall thinking -- having any thoughts on that?

A. No, I don't recall any thoughts on that.

Q. Okay. The end of that report of Dee's, it says, "Dee said that he needed to go let off some steam."

Help me understand what that means.

A. Where are we at here?

Q. About middle of the page, the end of Dee's report to you, the last sentence of Dee's report to you.

A.   What did that mean to me?  That he needed to go let off some steam.

Q.   What did you understand that to mean?

A.   That he was upset and needed to calm down.

Q.   Okay.  Did you observe him to be upset when you saw him?

A.   Yes.

Q.   And what signs did you see that he was upset?

A.   Mostly just in what he said.

Q.   The words?

A.   The words that he said.

Q.   Okay.  What about Dan?  How did Dan seem when he reported to you?

A.   He seemed upset.

Q.   Okay.  All right.  Then we have notes from the same day, it looks like, later on, am I right, after both Dan and Dee had come in?

And just to clarify, when Dan was in your office that day, February 18th, did you take that opportunity to discuss with Dan some of the allegations that you heard from his coworkers about these violent threats?

A.   No, I did not.

Q.   Is there a reason why you chose not to address that with Dan?

A.    Because I'm assuming he already knew.

Q.    And how do you think Dan would know what his employ- -- what his coworkers had said to you?

A.    Because I believe, if I remember correctly, I think he was put on leave before this.  Again, it's a little messy in my mind.  But I think he was put on leave before that, and he would have known because of that.

Q.    So is it your understanding that he was told when he was put on leave that it was because there had been allegations of violence by his coworkers?

A.    That's my understanding, but I'd have to read the letter and go back and look at my notes.

Q.    What letter would you read?  Where would you go to find that information?

A.    It would have been the letter of putting Dan on leave.

Q.    He got a letter specifically about --

A.    I thought he did, yes.

Q.    We can go through it.  I've got some letters.  Okay.

And that's the first leave or the second leave?  Did he get letters both times?

A.    I believe he did.

Q.    Both times, okay.

A.   Sorry.

Q.   Do you know whether Dan was given anything the day that he was escorted off?

A.   I don't know.

Q.   Do you know who would know that?

A.   Mark Mitton.

Q.   Okay.  Would there be anything in Dan's file if he was given anything when he was escorted off the premise on February 18th?

A.   If something had been given to him, I would assume so, yes.

Q.   Whose job would that be to put that in the employee file?

A.   If Mark would have given it to me, then I would have put it in the file.

Q.   On February 18th?

A.   Yes.

Q.   I don't think I've seen anything with that date, other than your notes from the meeting.  Okay.

Do have any idea why statements about work or safety weren't gathered until February 18th, when this interaction with Dee and Dan instead of earlier when they came to see you in early February?

A.   I'm not so sure that they didn't give me statements when they came in earlier.

Q. Okay. Well, we have that statement from Dustin Raney that had a date of February 20th.

A. Doesn't it say February 5th?

Q. The signed date on the bottom by the signature.

A. Yes. But I think he -- I think what happened -- I think he gave us the statement before, and then he was asked to sign it later.

Q. Do you recall whether he gave you a typed statement or a handwritten statement?

A. I believe it was a handwritten statement.

Q. Do you know who would have typed that?

A. I'm assuming he did because it was his statement.

Q. Okay.

A. But I don't remember.

Q. Okay. I will go ahead -- excuse me just a moment. So you don't recall when you got written statements from the other coworkers regarding -- we've got one here, Exhibit 5, a statement from Rusty Blackner. Do you recall when you received that statement?

A. Yes.

Q. Okay.

A. This one was on February 18th.

Okay.  Do you recall whether there was any instructions that if Dan returned to City property, that would be a trespass?

A.  Do I recall that there would be --

Q.  It's not -- sorry.  I'm just - I'm skipping over that.  Do not refer to that page.

A.  Okay, sorry.

Q.  Any discussion about whether Dan would be able to return to City property or whether that would be a trespass?

A.  I remember hearing something about that.

Q.  Who did you hear it from?

A.  Mark.

Q.  Okay.  Do you remember him saying Dan was not allowed back on property?

A.  I don't remember specifically.  I just remember that it was something that was talked about.

Q.  Okay.  Do you know if that's still in effect?

A.  I would assume so.

Q.  And do you know if Dan had any issues retrieving his property given his escort by the sheriff? Do you know if he was given time to gather his belongings?

A.  I wasn't there.  I don't know.

Q.  Okay.  Do you recall ever hearing that Dan was

not able to retrieve his possessions?

A.   I -- I don't know if he did or did not.

Q.   Do you recall -- did you participate at all in the Human Rights Commission investigation that happened before this lawsuit was filed?

A.   Did I participate in the Human Rights Commission investigation?

Q.   Mm-hmm.

A.   I don't really know what you mean by that.

Q.   A complaint was filed by Ms. Yeaman and Mr. Pherigo that went to the Idaho Human Rights Commission, and then they --

A.   Gathered information.

Q.   -- gathered information, the City provided a written response back to the Human Rights Commission.

A.   I - I provided information, yes.

Q.   Okay.

A.   Is that what you mean?

Q.   Yeah, whatever your participation was.  It was gathering information?

Do you recall speaking to anyone as part of that investigation?

A.   I don't recall speaking to anyone.

Q.   Okay.  Do you recall reading any of the documents related to that?

A.  Yes.

Q.  Do you recall the documents stating that Dan had not been able to retrieve his property?

A.  I believe that was in there.

Q.  Okay.  Do you know if anyone took any actions after that statement that Dan wasn't able to retrieve his property?  Did anyone make any efforts to ask him what the property was?

A.  Not that I'm aware of.

Q.  Or find a way for him to be able to retrieve his property?

A.  Not that I'm aware of.

Q.  Okay.  So we are close.  Last page.  And we're going to switch over to the discovery.  So last --

A.  Are you talking for me to get to the last page here?

Q.  I'm on my last page of questions to you, which is good for all of us.

A.  Okay.

MS. ANDERSEN:  So this will be my last exhibit.

(Exhibit 22 marked.)

Q.  (BY MS. ANDERSEN)  So did you help at all in preparing discovery responses for the Yeaman matter?

A.  Yes, I did.

REPORTER'S CERTIFICATE

I, JAHNENE ADMIRE, CSR No. 760, Certified Shorthand Reporter, certify:  That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony and all objections made were recorded stenographically by me and transcribed by me or under my direction;

That the foregoing is a true and correct record of all testimony given, to the best of my ability;

I further certify that I am not a relative or employee of any attorney or party, nor am I financially interested in the action.

IN WITNESS WHEREOF, I set my hand and seal this 22nd day of September, 2022.

_____

JAHNENE ADMIRE, CSR 760, RPR

Notary Public

P.O. Box 2636

Boise, Idaho  83701-2636

My commission expires May 04, 2024

# EXHIBIT E

**DECLARATION OF COUNSEL KELLY ANDERSEN, IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT [DKT.20] – EXHIBIT E**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


OTTIS D. PHERIGO, an            )

individual,                    )

            Plaintiff,        ) Case No. 4:21-cv-364

            vs.               )

CITY OF BURLEY, an Idaho       )

municipal corporation,         )

            Defendant.        )

_____)




DEPOSITION OF RUSTY BLACKNER

TAKEN SEPTEMBER 12, 2022

IN BURLEY, IDAHO

Q.  -- at this time?  Okay.

It says, "I feel that Dan is a threat and should not be allowed at work."

And so am I correct that this interaction you had with Dan was on February 3rd?

A.  I don't know the date.

Q.  I'm getting that off of --

A.  Yes.

Q.  -- your statement.

A.  Yes.  So it was that day.

Q.  Okay.  Because I'm noticing it was -- the event happed on February 3rd, and the signed statement happened on February 18th.  So I'm wondering, did something happen between those two dates, or that's kind of a --

A.  They gave him two weeks off of work for -- I don't know the reason why.  And that's when he came back to work.

Q.  On the 18th?

A.  On the 18th.

Q.  You don't know why Dan was off work?

A.  For -- I have no clue, actually.  I think it was for grievance or something.  I don't know.

Q.  What do you mean by "grievance"?

A.  That she -- he was sad that she got fired, so

they gave him two weeks off.

Q.   To kind of mourn the loss of her employment?

A.   That's what I understood.

Q.   Okay.  Were you aware any -- at this time, let's say, by February 18th whether any allegations of sexual harassment had been made against Dodge?

A.   No.

Q.   You were not aware.

Did any investigator ever contact you to ask about whether you observed any sexual harassment?

A.   Don't remember, no.

Q.   You have no recollection of being asked?

A.   No.

Q.   Okay.  So is my statement here asking about sexual harassment, is this the first time that you've heard that there's allegations against Dee for sexual harassment?

A.   No.

Q.   When was the first time you heard about it?

A.   I don't know.

Q.   Do you know if it was before or after Lindsey was terminated?

A.   It was after, yes.

Q.   The allegations were made after?

A.   Yeah -- or -- yeah.

Q.  Do you know whether or not on January 6th, 2020 -- so this would be, you know, almost a month earlier -- whether Lindsey ever reported anything about Dee to HR?

A.  No.

Q.  Okay.  All right.  And so it's fair to say that you took it literally that you thought Dan would do physical violence on Dee?

A.  Yes.

Q.  And so did you know that Dan was going to come back to work on February 18th?

A.  I think so, yeah.  I -- or I was wondering why he was back at work when I showed up.

Q.  Was it your understanding that he'd been --

A.  Terminated.

Q.  -- terminated?  Okay.

A.  Yeah, or fired or however you want to word it.

Q.  Okay.  So you thought when you didn't see Dan anymore around February 3rd that he had been fired?

A.  Yes.

Q.  Okay.  And did you ever go and talk to Carol about Dan, these -- this violence issue?

A.  Other than this, no.

Q.  Okay.  So we've got this statement on the 18th.  Do you recall talking with Carol before the 18th

about your concerns?

A. I don't think I did.

Q. Okay. Do you recall ever talking to Dustin about your concerns about Dee getting killed by Dan?

A. Probably, yes.

Q. Do you recall whether you ever talked to Stormy about those concerns?

A. Yes.

Q. Sorry?

A. Yes.

Q. Okay. What do you recall saying with Stormy?

A. Same thing what I wrote here.

Q. Okay. Did Stormy also hear -- did he tell you that he heard that Dan was going to kill Dee?

A. As far as I know, yes.

Q. Okay. Do you recall ever going with anyone to talk to Carol around this time to tell them about Dan?

A. I thought Stormy came with me, but I think it might have been Dustin.

Q. And came with you to --

A. It was a long time ago. I don't really remember.

Q. Fair. Came with you to speak with Carol?

A. Yes.

Q. Do you recall, was Mark there?

Q.  Okay.  Do you recall Dan having a doctor's appointment on February 18th, 2020, being gone for --

A.  No.  No.

Q.  Do you know whether Dee talked to you or your coworkers about writing statements about Dan --

A.  No.

Q.  -- on that day?

A.  No.

Q.  Okay.  All right.  Did you ever think of calling the police to report the threat that Dan had made against Dee?

A.  No, because he had left work, so I figured he was gone.

Q.  So you didn't think, say, Dan would kill Dee outside of work?

A.  I don't know.  No.

Q.  Did you take the threat seriously?

A.  Yes.

Q.  Okay.  Do you recall hearing from anyone that Dan was not going to be allowed on City property?

A.  Can you repeat that?

Q.  Did you hear from anyone that Dan would not be allowed back on City property?

A.  Yes.

Q.  Who told you that?

A.  Dee Hodge.

Q.  Dee Hodge told you that.

Do you recall when Dee told you that?

A.  I'm guessing it was on February 18th.

Q.  Okay.  Do you recall if anyone else was around when you were told that?

A.  No.

Q.  Okay.  Do you recall -- do you know whether or not that's still in effect?

A.  As far as I know, yes.

Q.  Okay.  All right.  Do you know of anyone that quit the office and claimed that the reason they quit was the behavior of Dee Hodge?

A.  No.

Q.  Do you recall Jaimee Oppe ever working at the office?

A.  Yes.

Q.  Do you recall her relationship with Dee?

A.  No.

Q.  You recall nothing about her relationship with Dee?

Do you recall the day --

A.  She worked there.

Q.  Do you recall her last day of work, the last time you saw her?

Q.  Did you ever threaten to beat Jason Scherer with a shovel?

A.  No.

Q.  Do you recall getting any discipline from anyone at work about any actions involving a shovel or threats?

A.  No.

Q.  Okay.  Do you recall making an inaccurate statement on your employee application that you had completed high school?

A.  I don't how that's relevant to anything.

MR. ANGELL:  Say that one more time.

Q.  (BY MS. ANDERSEN)  Do you recall making a statement on your employee application that you had completed high school?

MR. ANGELL:  Yeah, I mean, it's probably not relevant.  Do you really need to know that answer to that one?

MS. ANDERSEN:  We're looking at how different employee evaluations are being treated.

MR. ANGELL:  I would say answer that if you know the answer to it.

THE WITNESS:  Yes.  I did, I guess, yes.

Q.  (BY MS. ANDERSEN)  Do you recall getting disciplined for that?

55

REPORTER'S CERTIFICATE

I, JAHNENE ADMIRE, CSR No. 760, Certified Shorthand Reporter, certify:  That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony and all objections made were recorded stenographically by me and transcribed by me or under my direction;

That the foregoing is a true and correct record of all testimony given, to the best of my ability;

I further certify that I am not a relative or employee of any attorney or party, nor am I financially interested in the action.

IN WITNESS WHEREOF, I set my hand and seal this 21st day of September, 2022.

_____

JAHNENE ADMIRE, CSR 760, RPR

Notary Public

P.O. Box 2636

Boise, Idaho  83701-2636

My commission expires May 04, 2024

# EXHIBIT F

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

OTTIS D. PHERIGO, an individual,  )

                    Plaintiff,    )

                    vs.           ) Case No. 4:21-cv-364

CITY OF BURLEY, an Idaho          )

municipal corporation,            )

                    Defendant.    )

_____)

DEPOSITION OF CHELSEY FERRIN

TAKEN SEPTEMBER 12, 2022

IN BURLEY, IDAHO

A.   Told me to stay out of it.

Q.   Okay.  You weren't sure exactly what that --

A.   He just told me to stay out of it.

Q.   Okay, that's fair.

Do you recall any of your coworkers talking with you that day about things Dan had said to them, like Dustin?

A.   Yeah.

Q.   Okay.  What did --

A.   I mean, everyone says, you know, Dan said this or Dan said that, but I personally did not hear that, so.

Q.   So it sounds like what you heard from Dan was different than what they were telling you they had heard from Dan; would that be accurate?

A.   Yeah.  Dan protected us, for sure.

Q.   And when you say "us," help me --

A.   Me and Lindsey.  He was good to us.

Q.   Do you know if he protected anybody else?

A.   I don't -- I don't know protected.  He was just good to us.  Like, he was just -- I don't know what -- if "protected" is the right word, but he's just like "don't get involved."

Q.   And you took that to mean he was concerned that you might lose your job?

REPORTER'S CERTIFICATE

I, JAHNENE ADMIRE, CSR No. 760, Certified Shorthand Reporter, certify:  That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony and all objections made were recorded stenographically by me and transcribed by me or under my direction;

That the foregoing is a true and correct record of all testimony given, to the best of my ability;

I further certify that I am not a relative or employee of any attorney or party, nor am I financially interested in the action.

IN WITNESS WHEREOF, I set my hand and seal this 23rd day of September, 2022.


_____

JAHNENE ADMIRE, CSR 760, RPR

Notary Public

P.O. Box 2636

Boise, Idaho  83701-2636

My commission expires May 04, 2024

# EXHIBIT G

**DECLARATION OF COUNSEL KELLY ANDERSEN, IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT [DKT.20] – EXHIBIT G**



WORST, STOVER, GADD
& SPIKER, P.L.L.C.

Richard J. "Tug" Worst
Timothy J. Stover
David W. Gadd
Louis V. Spiker
Kelly H. Andersen
Benjamin P. Andersen
Christopher P. Slette
Romeo "Kade" Beorchia
Mark D. Nicolarsen

*Attorneys At Law*

**WILSON & McCOLL**
Jeffrey M. Wilson
Brian F. McColl

*Of Counsel*

May 1, 2020
*Via Regular and Certified Mail*

Ellen Maier
City Clerk
P.O. Box 1090
1401 Overland Ave.
Burley, ID 83318

# NOTICE OF TORT CLAIM

**Employment Discrimination, Sexual Harassment, Retaliation, and Wrongful Discharge, Americans with Disabilities Act and Idaho Protection of Public Employees Act**

Dear Sir or Madam:

This firm represents Ottis Daniel Pherigo, Jr. ("Mr. Pherigo"), a former employee of the City of Burley, Wastewater Department. He worked in the Wastewater Department of the City of Burley from October 2009 until March 16, 2020. Please direct all correspondence to the offices of Worst, Stover, Gadd & Spiker, PLLC, P.O. Box 1428, Twin Falls, Idaho 83303.

You are hereby notified pursuant to Idaho Code § 6-901, et seq. and Idaho Code § 50-219, that Mr. Pherigo hereby makes claims against the City of Burley ("City"), together with its assigns, affiliates, employees, agents, and all other individuals acting in their official capacity on behalf of the City. In support of said claims, Plaintiff states as follows:

*Please direct all correspondence to our Twin Falls office at the address noted below*

Twin Falls Office:
905 Shoshone Street North, Twin Falls, ID 83301
P.O. Box 1428, Twin Falls, ID 83303-1428
Phone: (208) 736-9900 / Facsimile: (208) 736-9929
www.magicvalleylaw.com

Boise Office:
3858 North Garden Center Way, Suite 200, Boise, ID 83703
P.O. Box 1544, Boise, ID 83701
Phone: (208) 345-9100 / Facsimile: (208) 384-0442

1.  <u>Conduct or circumstances which brought about the injury or damage</u>.

    Dee Hodge created a hostile work environment and retaliated against Mr. Pherigo after Mr. Pherigo reported the sexual harassment and discrimination committed by Mr. Hodge against Mr. Pherigo's coworkers Lindsey Yeaman.

    On January 6, 2020, Mr. Pherigo drove Ms. Yeaman to the office of Carol Anderson where Ms. Yeaman reported some of the harassment that she had suffered by Mr. Hodge.

    On February 3, 2020, Mr. Pherigo met with Ms. Anderson to report the sexual harassment that Ms. Yeaman had suffered from Mr. Hodge. Mr. Pherigo was placed on paid administrative leave that afternoon pending the investigation. On February 13, Mark Mitton informed Mr. Pherigo that the investigation had not found any harassment and that Mr. Pherigo could return to work on February 18, 2020.

    On that day, Mr. Pherigo returned to work and informed Mr. Hodge that he would need to leave work to attend a medical appointment later that day. Mr. Hodge became confrontational and accused Mr. Pherigo of tampering with the PLC program. Mr. Hodge also accused Mr. Pherigo of coming into work drunk and asked for his resignation.

    Mr. Pherigo reported these accusations to Ms. Anderson that morning. Both of these allegations against Mr. Pherigo were untrue and wholly unsubstantiated. It was clear that Mr. Hodge sought to retaliate against Mr. Pherigo for his role in reporting the abuse suffered by Ms. Yeaman and was angered by Mr. Pherigo's request to attend a medical appointment for his rheumatoid arthritis.

    Later that day, Mr. Mitton and a police officer appeared at Mr. Pherigo's work. They falsely claimed that Mr. Pherigo had made a death threat against Mr. Hodge. Mr. Pherigo was sent home on leave. After a hearing, Mr. Pherigo was wrongfully terminated on March 16, 2020. Mr. Pherigo was informed that he would face charges for criminal trespass if he set foot on City property. Mr. Pherigo has been unable to retrieve his personal property and tools located at work and valued at $2,000.

    Mr. Pherigo's wrongful termination was effectuated in direct retaliation for his whistleblowing and complaint of sexual harassment regarding the Mr. Hodge's unlawful and inappropriate behavior. The City's actions by and through Mr. Hodge, Ms. Anderson, and Mr. Mitton, constitute a violation of Idaho Code including § 6-2104(4) which prevents an employer from taking action against an employee because the employee communicates in good faith the violation of a law, rule, or regulation. It also violates Idaho Code § 67-5911.

2.  <u>Plaintiff's injury or damage</u>. As a result of the City's negligent, grossly negligent and reckless failure to fully investigate complaints regarding the supervision of the Wastewater Department and a result of the retaliation against Mr. Pherigo for his reporting the actions of Mr. Hodge and requesting time off work to attend a medical appointment, Plaintiff has suffered

a. Hostile work environment;
b. Retaliation;
c. Lost property worth $2,000;
d. Wrongful termination;
e. Lost Wages and benefits, past and future;
f. Violation of his rights under the Americans with Disabilities Act; and
g. Emotional distress

3. <u>Time and place of the injury or damage</u>. Mr. Pherigo was subject to a hostile work environment during the time that he was employed by the City of Burley Wastewater Department. He was a witness to the yelling, aggressive behavior committed by Mr. Hodge. Mr. Pherigo was wrongfully discharged on or about March 16, 2020 after reporting Mr. Hodge's harassment.

4. <u>Names of all persons involved</u>. Plaintiff identifies the following persons involved:

a. Dee Hodge, Director of Wastewater Services, perpetrator.
b. Carol Anderson, Human Resources.
c. Jean Gorringe, Pretreatment Coordinator, retired.
d. Dustin Rainey, Supervisor.
e. Glen Rolley, Collection Operator.
f. Stormy Oldham, Collection Operator.
g. Rusty Blackner, Operator.
h. Davin Townbridege, Operator.
i. Chelsey Farrin, Lab Technician, witness.
j. Mark Moosman, City of Burley Plumbing Inspector.
k. Mark Mitton, City of Burley Administrator.
l. Lindsey Yeaman, Pretreatment Coordinator, victim of sexual harassment.
m. Otis Daniel Pherigo, Witness, reporter of wrongdoing.

5. <u>Amount of damages</u>. Plaintiff has been damaged in the amount of not less than $500,000 which represents damages as under all circumstances of the case may be just.

6. <u>Statement of residence</u>. Mr. Pherigo is a resident of Burley, Idaho and has been a resident all times material hereto. Mr. Pherigo lives at 1511 Burton Ave., Burley, ID 83318

You are hereby notified of Mr. Pherigo's claim against the City of Burley, as set forth herein. I look forward to your response within ninety (90) days as required under Idaho Code § 6-909.

Mr. Pherigo expressly reserves the right to assert additional claims and additional categories of damages as information relative to the retaliation, sexual harassment, sexual discrimination, Americans with Disabilities Act, and wrongful termination develop.

Sincerely,

Kelly H. Andersen
Attorney for Mr. Pherigo

KHA/lmr
cc: Client

USPS TRACKING #

9590 9402 3677 7335 4303 78

**United States Postal Service**

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4® in this box•

**WORST, STOVER GADD & SPIKER, P.L.L.C.**
P.O. Box 1428
905 Shoshone St. N.
Twin Falls, ID 83303-1428

RECEIVED MAY 0 6 2020



**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)        $ _____
☐ Return Receipt (electronic)      $ _____
☐ Certified Mail Restricted Delivery  $ _____
☐ Adult Signature Required         $ _____
☐ Adult Signature Restricted Delivery $ _____

5-1-20

Postmark
Here

Postage
$

Total Postage and Fees
$

Sent To
*Ellen Maier-Burley City Clerk*

Street and Apt. No., or PO Box No.

City, State, ZIP+4®
*re: Daniel Pherigo*

PS Form 3800, April 2015 PSN 7530-02-000-9047        See Reverse for Instructions

# EXHIBIT H

**DECLARATION OF COUNSEL KELLY ANDERSEN, IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT [DKT.20] – EXHIBIT H**

**Attachment to Idaho Human Rights Commission Form:**

Ottis D. Pherigo

What happened to you that you believe was discriminatory? Include the date(s) of harm, the action(s), and the name(s) and title(s) of the person(s) who you believe discriminated against you. Please attach additional pages if needed. *(Example: 10/02/13 – Discharged by Mr. John Doe, production supervisor*

- **October 18, 2018**. I missed work due to health issues caused by my rheumatoid arthritis. On that day, Dee Hodge, Director of Wastewater Services, informed my coworkers that I was fired. He instructed them to gather my belongings and place them in boxes.
- **October 19, 2018**. I returned to work the following day. I asked my coworkers about my boxed belongings. They told me that they were instructed to do so because I was fired. When I saw Carol Anderson of human resources later that day, I asked her why my belongings were in boxes and my coworkers were informed that I was fired. I had taken off work the previous day due to my medical condition. The city eventually sent a letter of apology to me.
- **Start date-March 16, 2020**: Sexualized environment. Dee Hodge was in a relationship with someone he supervised, Jean Gorringe. Other employees and I would witness them going for frequent rides in Mr. Hodge's truck. We would see them parked at various locations around town, not on City business. When Ms. Gorringe retired, Mr. Hodge began sexual advances against her replacement, Ms. Lindsey Yeaman.
- **Multiple Dates**: Mr. Hodge would yell at people in the wastewater department. This was generally directed at the women in the office if any detail was not to his liking.
- **January 6, 2020**: I observed my coworker, Lindsey Yeaman walking down the hallway at work looking distraught. She told me that she was going to City Hall to report harassment that she had suffered from Mr. Hodge. I offered to drive Ms. Yeaman to City Hall and accompany her. She looked upset and not in a condition to drive. I attended the meeting with Carol Anderson and Mark Mitton. I verified some of Mr. Hodge's aggressive behavior that I had witnessed, including the fact that he provided Ms. Yeaman with more stringent rules than the other workers in the department.
- **January 31, 2020**. I was informed that Ms. Yeaman was terminated. I also learned that in addition to his yelling, Mr. Hodge had sexually harassed and inappropriately touched Ms. Yeaman.
- **February 3, 2020**. I went to City Hall and reported Mr. Hodge's sexual advances and inappropriate touching of Ms. Yeaman to Ms. Anderson.
- **February 3, 2020**. (Later the same day). I was placed on administrative leave pending the results of the sexual harassment investigation.
- **February 10, 2020**. I attended Ms. Yeaman's termination hearing with her.
- **February 13, 2020**. Mark Mitton informed me that the investigation found no sexual harassment against Ms. Yeaman. I was told to report back to work on February 18, 2020.
- **February 18, 2020**. I reported to work. That morning, I informed Mr. Hodge that I had a doctor appointment that day. He became angry and accused me of tampering with the PLC program. Mr. Hodge also accused me of being drunk on the job. At this point, Ms. Yeaman had already been

terminated and I understood that my job was at risk. I had also made a report against Mr. Hodge with Carol Anderson of Human Resources on February 3, 2020.

I informed Mr. Hodge that he was being a bully, a drunk, and a coward. I told Mr. Hodge that I did not tamper with the PLC program and that I had never come to work drunk. Mr. Hodge then told me that he would take my resignation.

- **February 18, 2020.** (Later that same day). I went to Carol Anderson of Human Resources to report the behavior of Mr. Hodge that morning. Mr. Hodge was retaliating against me for accompanying Ms. Yeaman to her report and hearing as well as for making my own report on February 3, 2020. I informed Ms. Anderson that I would keep written records from that point of Mr. Hodge's behavior. I returned to work.

- **February 18, 2020.** (Later that same day). Mr. Mitton appeared in the control room with a police officer. Mr. Mitton informed me that he had documented and signed papers that I had made a death threat against Mr. Hodge. I was informed that if I went on any property belonging to the City, I would be cited for criminal trespass. My work phone and keys were taken. I was not provided with the opportunity to retrieve my personal tools at work. They are valued at $2,000. I was also forbidden from gathering my other belongings at work.

- I never made a death threat against Mr. Hodge. I did speak to my coworkers and warn them not to get involved. Ms. Yeaman was fired and I was in trouble for supporting her. I did not want them to get involved because their jobs would be at risk too.

- **February 26, 2020**. I received a certified letter from Mr. Mitton with a Notice of Proposed Disciplinary Action of Termination. It contained an accusation that I made a death threat against Mr. Hodge on February 3, 2020.

- This threat was allegedly made on the same date that I filed a report of sexual harassment against Mr. Hodge. Despite the alleged threat of February 3, 2020, I had been instructed to return to work on February 18, 2020. I was not aware of any allegations of threats made by me until after I reported Mr. Hodge's behavior to Ms. Anderson on February 18, 2020.

- **March 5, 2020**. I met with Mr. Mitton and Ms. Anderson regarding my proposed termination. I informed Mr. Mitton that I had never made threats against Mr. Hodge. I had only warned my coworkers not to get involved because I did not want them to also lose their jobs.

- **March 18, 2020**. I received a certified letter in the mail from Mr. Mitton. It stated that I was terminated effective March 16, 2020. The letter stated that employee safety was a priority. I knew that my termination was based on my report of sexual harassment against Mr. Hodge and my assistance to Ms. Yeaman as she reported the harassment that she received.

## Why do you believe these actions were discriminatory, i.e. because of your race, color, national origin, sex, religion, age disability or retaliation?

I know that I was placed on administrative leave because of my report of the sexual harassment of Ms. Yeaman by Mr. Hodge. I was informed that I would be placed on leave during the investigation. This forced leaved occurred on February 3, 2020, the same day that I made the report.

I know that the actions against Ms. Yeaman were discriminatory. Mr. Hodge did not make sexual advances against the men in the office. He only made sexual advances on the women and focused his bullying on the women.

I knew that Ms. Yeaman was being treated differently by Mr. Hodge. I observed that other employees in the office were allowed to wear a cap, but she was not allowed to wear a cap. Other employees were allowed to leave the office to get coffee. Mr. Hodge would not allow Ms. Yeaman to leave the office to

get coffee. He would watch me walk into the office to drop off a coffee to Ms. Yeaman at times. He never stopped me from doing so. Mr. Hodge never informed me that I was not allowed to leave to get coffee.

Mr. Hodge would go for frequent rides in his truck with Ms. Gorringe during the time that she worked for the City. He also made invitations for Ms. Yeaman to ride in his truck. He never invited me to go for a ride in his truck. I also never observed Mr. Hodge invite any men to go for a ride in his truck. These invitations were only extended to women.

On February 18, 2020, my first day back at work after my report of the harassment, Mr. Hodge treated me harshly and made groundless accusations of tampering with the computer system and drunkenness. His anger began when I told him that I had a doctor appointment that day. My doctor appointment was related to my medical disability of rheumatoid arthritis.

When I denied tampering with the program and being drunk, he yelled at me. Mr. Hodge also asked me for my resignation that morning. Later that same day, I was provided with a Notice of Termination and escorted out of the building. This timing was not a coincidence.

I suffer from rheumatoid arthritis. This requires me visit the doctor at times and take certain medications. On October 18, 2018, when I was out of the office due to my medical condition, Mr. Hodge told my coworkers that I was fired. I returned to find my belongings packed up in boxes. I believe that Mr. Hodge informed my coworkers that I was fired to retaliate against me for missing work due to my disability.

**Name and describe others who were in the same situation as you. Explain any similar or different treatment. Highlight who was treated better and who was treated worse, and who was treated the same as you? Please attach additional pages as needed.**

Jamie Opee worked previously as Mr. Hodge's secretary. It is my understanding that she reported his inappropriate behavior to Ms. Anderson. Shortly afterwards, Ms. Opee was no longer employed by the City.

Ms. Yeaman made a report to Ms. Anderson regarding Mr. Hodge's behavior. A few weeks later, Ms. Yeaman received a Notice of Termination and was then terminated.

I made a report to Ms. Anderson regarding Mr. Hodge's behavior toward Ms. Yeaman. I was placed on leave that same day. I received a Notice of Termination on my first day back from the imposed leave for making the report.

In my experience, individuals who report the behavior of Mr. Hodge to Ms. Anderson at Human Resources do not remain employed by the City.

Individuals who do not complain about Mr. Hodge remain employed with the City. Women who resist his advances are treated harshly. Women who comply with his advances are treated well.

Mr. Hodge would at times display abusive behavior such as yelling towards those at the office. However, I do not believe that he ever made sexual advances on the men. He only made sexual advances and invitations to go for "rides in his truck" to women.

Ms. Gorringe would go for rides in Mr. Hodge's truck. She was not present at the office for long periods of time during the day. I never observed Ms. Gorringe being called out by Mr. Hodge for her absences. Ms. Gorringe received favorable treatment at the office.

Ms. Yeaman rejected Mr. Hodge's advances. Ms. Yeaman was not allowed to even leave the office to get a cup of coffee. She was not allowed to wear a cap. Mr. Hodge placed additional rules on Ms. Yeaman that isolated her from the other coworkers.

**Are there any witnesses to the alleged discriminatory incidents? If yes, please identify them and tell us what you believe they will say. Please attach additional pages if needed.**

The employees at the Wastewater Department witnessed much of Mr. Hodge's hostile behavior and yelling.

- Ms. Lindsey Yeaman pretreatment coordinator, was the recipient of Mr. Hodge's harassment. She no longer works at the City. She was fired for reporting Mr. Hodge's harassment.
- Ms. Chelsey Farrin, a coworker, still works there and has witnessed Mr. Hodge's aggressive behavior.
- Ms. Jean Gorringe: Prior Pretreatment Coordinator, was subjected to Mr. Hodge's sexual advances. Ms. Gorringe often went for rides in the truck with Mr. Hodge.
- Ms. Carol Anderson: Human Resources. She received Ms. Yeaman's complaint regarding Mr. Hodge's behavior. She was also present at the hearings and received my complaints regarding Mr. Hodge's behavior towards Ms. Yeaman and his later behavior towards me. Ms. Anderson should be able verify that complaints were made and the dates of the complaints.
- Mr. Mark Mitton. He can testify regarding the hearings that he attended. He sided with Mr. Hodge and found no sexual harassment.
- Dustin Rainey, Stormy Oldham, and Rusty Blackner. These individuals signed the allegation by Mr. Hodge that I had threatened Mr. Hodge. These allegations are untrue. I am uncertain about how they would testify as witnesses. The remaining coworkers in the office have observed two individuals fired recently for filing complaints regarding Mr. Hodge. Their willingness to speak out against him would depend on their willingness to risk their jobs.

# EXHIBIT I

January 6, 2020

Lindsey Yeaman and Dan Pherigo came to my office. Lindsey started to talk about her supervisor, Dee Hodge. She said that he told her "You are never here and not doing your job." Lindsey said that she has been sick. She talked about sending samples to outside labs for wastewater and four DEQ people doing an audit.

Lindsey stated that she has a whole set of different rules than anyone else in the department. Lindsey said this at least twice in the meeting. I asked her what the rules were, and she said she can't leave the building and the other employees don't know about her rules. They aren't written down.

Lindsey stated that she got hurt in the lab and she took a whole week off and went to the Chiropractor and paid for everything herself. I asked her why she didn't report this as a worker's claim. She shrugged her shoulders. She told me that she had told Dustin about the injury but said she told Dustin that she didn't want to make a claim.

Lindsey said that Dee was always had a mad face like a bull dog.

Lindsey said that she was told that Dee had said that he is going to make it where Lindsey doesn't have the job.

Lindsey reported that in the month of December she had some health issues and was gone quite a bit in the month of December.

Lindsey reported that when she went to North Carolina for a pretreatment conference 20 minutes before she left Dee told her that her job was on the line.

Lindsey stated that Dee barely talks to her.

Lindsey reported that when she took time off to help her son, that Dee had said "Your son is not 2, why do you need to go he is big?"

Lindsey reported that this conversation happened on June 29, 2018, when Lindsey had used sick leave to stay home to be with Jayden. Lindsey reported that Jayden is disabled and was having a problem. Dee told her not to abuse sick leave and don't use Jayden for that.

Lindsey stated that Dee needs to stop harassment. Lindsey stated that "that she can no do anything right. No help"

Lindsey talked about permits and DEQ . She reported that she had printed off a report for DEQ and gave it to Dee and he asked why the report was so big. Lindsey stated to put everything on it.

Lindsey said that Dustin Raney had come to her and told her that "I'm not your supervisor anymore, because I'm too nice to you."

At this point I have no more notes.  My memory is that I went and go Mark and he came in the room and he started taking notes at that time.  Lindsey talked more about being bullied by Dee.

BURLEY0020

# EXHIBIT J

2-5-2020 Documentation by Dustin Raney

On 1/31/2020 at approximately 9:30 AM Dee arrived at the treatment plant with Carol Anderson.  They went in Lindsey Yeamans office and gave her papers and placed her on administrative leave (pre termination-I believe).  I was asked to help pack her belongings and escort her out.  She left immediately without collecting any belongings stating that would be back later that day to collect them.

Dan talked to Lindsay and determined that he would collect her belongings and deliver them to her. I assisted him with the packing process that same day.

On the morning of 2/3/2020 right after work began, Dan approached me and stated that Dee had crossed the line and when shit hits the fan I need to stay out of it because he doesn't want anyone else getting hurt. Rusty came to me about an hour later and informed me that Dan had told him the same thing. Stormy also came to me with concerns for everyone's safety and stated that he was worried about what dan may do.  The next morning, I told Dee what Dan had said and about the others concerns and we went to city hall and discussed the matter with Carol Anderson and Mark Mitton. Carol took meeting notes. Mark told us that he doesn't believe that Dan meant anything about his statements being of a physical nature. He also informed us that Dan had filed a sexual harassment complaint against Dee and that we would both be being contacted by the County Administrator, who would be conducting an investigation, for questioning.

I was contacted by the County Administrator at 3 pm on 2/4/2020 and was asked to come to his office to discuss the complaint and I went up and did a recorded interview with him.  On the morning of 2/5/2020 I was informed by Dee that Dan had sent home on administrative leave until these matters had been resolved. We also had a staff lunch that day to discuss the allegations towards Dee, Lindsays termination being strictly due to lack of job performance, and about Dan being placed on administrative leave because he was very emotional and making threats.  Stormy, Dee and I expressed that we were concerned for all of our safety because of Dans mental state and because of the threats that were made.

2/6/2020

Stormy asked me to accompany him to city hall to discuss his concerns with Mark and Carol. Carol took meeting minutes while we were there. He spoke about how nervous we are for the staff safety now and especially any retaliation from Dan now or if he is allowed to return to work. He also discussed the city policy portion about employees not being allowed to carry firearms and how that rule should be revised so that we could be allowed to protect ourselves.  Mark told him the same thing he told Dee and me.

2/20/2020

BURLEY000002

# EXHIBIT K

**DECLARATION OF COUNSEL KELLY ANDERSEN, IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT [DKT.20] – EXHIBIT K**

I Rusty Blackner had Dan approach me on Feb 3 after lindsey was told to leave work on friday and dan told me that he was going to kill dee and that he wanted me and my other co-workers to stay out of the way because he didn't want anyone else to get hurt. now I do not feel comfortable being at work for fear of getting hurt or ome of my co-workers getting harmed. I feel that dan is a threat and should not be aloud at work.

Rusty Blackn       2-18-20

BURLEY000059

# EXHIBIT L

February 18, 2020

8:47 AM

Dan Pherigo came to my office and asked if he could speak with me.


Dan told me that first thing this morning he went and told Dee that he had a doctor's appointment at 11:00 AM. Dee told him that CST has been making changes to the computers and that Dan would need to keep a detailed record of the changes. Dan said that Dee accused him of messing with the equipment.

I asked Dan if he had actually said that Dan was messing with the equipment and he said yes.

Dan stated that Dee was standing 6' feet away from him and asked him if had been drinking.

Dan said I have seen the hell that he put Lindsey through, been through two secretaries neither lasted for more than a year. There is a pattern with this guy (Dee).

Dan said I'm going to wear a recorder to protect myself. I'm going to record all the conversations.

Dan said it was useless to come to me (Carol) He stated that Mark wasn't going to do anything either.

Dan said that he was going to go to the Idaho Labor Board and get help. Dan said I'm not putting up with this. I helped my friend and now I'm being harassed for standing up for someone.

Dan said I can't leave Chelsey, I need to protect her from him (Dee).

I asked him what he wanted and he talked about moving to the Water Department, he stated that with his skill sets, that would be the most logically place to move to with his Scada and maintenance background. Then he stated I don't want to leave Chelsey, Dee will start on her. Been here for 10 years, I have seen what he has done.

Dan stated that he would get legal council and that he would have detailed logs of what is going on. He was going to record everything and it wouldn't be long before he would have a lawyer involved.


February 18, 2020

About 8:45 AM

Dee came into my office.

Dee stated that Dan had told him that he was going to wear a recording device all the time. Dee said that Dan had told him that he was not going to talk to him (Dee) anymore. Dustin was now going to be his supervisor.

BURLEY000006

Dee said that Dan said some dirty stuff about Lindsey and Dee being after her for two years. Dee reported that Dan said don't try me next. Dan had said to Dee that he was going to get the Department of Labor involved. Dee said that Chelsey was stuck in the corner and heard the whole conversation.

Dan told Dee "I have nothing to say to you. "

Dee reported that he asked for a detailed list of the control systems going through the system and he had asked Dan to focus his attention on maintenance. Dan said Don't start on me and Dee said that Dan had used several "F" bombs.

Dee told Dan that he accepted resignations any day of the week and Dan said "I wouldn't give you the satisfaction"

Dee reported that Dan smelled like alcohol and he said something to Dan and Dan said I don't drink alcohol anymore and you are the "f"ing sponge around here.

Dan started in on things about Lindsey and Dee said you already reported me for all that.

Dee said to me "How is it that an employee can come in and behave like that and it is okay?"

I told Dee that I had asked Mark and Dave to come to my office because Dan had come in this morning and already reported a very similar story. Dee said that he needed to go let off some steam.


February 18, 2020

About 10:30 AM

Rusty came into my office and asked if I had a minute. He asked if Mark could come to my office too. After Mark was in my office.

Rusty asked how could someone that had threatened to kill someone be allowed at work. Rusty stated that Dan had threatened to kill Dee. Rusty thought that Dan had been let go and now he is back.

Rusty stated that Dan told hi that he was going to kill Dee and to stay out of the way. Rusty stated that Dan said he would beat Dee to death and kill him.

Rusty asked if Dan was going to come in and shoot someone. Rusty stated that he didn't feel safe at work. Rusty said that Dan came in yelling and screaming at Dee first thing this morning.

Mark stated that we had complaints about Dan saying that he didn't want anyone to get hurt, but this was the first time that we had heard that Dan had said he was going to kill someone. Mark explained that Dan had been put on administrative leave to cool things down, but apparently he didn't work.

Rusty stated that something was going on between Dan and Lindsey. He said that Dan would buy her gifts – a friendship necklace and Dan had bought Lindsey's son a laptop. Dan was buying car seats for Lindsey's kids and he would buy lunch for Lindsey and Chelsey.

Rusty stated that he thought this was kinda weird, both of them are married women. Weird to be buying them gifts. Rusty said that he wouldn't want someone buying gifts for his wife, it would be

BURLEY000007

upsetting.  Rusty said I like my co-workers, but I don't buy them gifts.  Rusty stated that this could be the reason Dan was so upset when Lindsey left.

Rusty talked about how he didn't feel safe at work and wanted to be able to protect himself.  Mark talked about keeping the gates locked to keep people safe. Rusty stated that wouldn't help, because Dan has the keys and passwords to get in.

BURLEY000008

# EXHIBIT M

**DECLARATION OF COUNSEL KELLY ANDERSEN, IN RESPONSE TO MOTION FOR
SUMMARY JUDGMENT [DKT.20] – EXHIBIT M**

PRIVILEGED AND CONFIDENTIAL

## Memorandum of Investigation

Date:  February 10, 2020

To:  Carol Anderson, HR Director at City of Burley, Idaho
From:  Kerry D. McMurray, Attorney-at-Law

### Background:
I was contacted on February 3, 2020 to conduct a third-party investigation regarding personnel issues at the wastewater treatment department for the city of Burley. On Tuesday, February 4, 2020 I begin interviews with regard to this investigation.

The context for this investigation begins with the City of Burley Wastewater Treatment employee by the name of Lindsey Yeaman receiving a notice of proposed action from the City of Burley on January 31, 2020. The following Monday, February 3, 2020 Dan Pherigo, a coworker, approached the city HR department Director Carol Anderson at her office at City Hall. He indicated to Carol Anderson that the action proposed against Lindsay Yeaman was not right. He claimed it was based upon "sexual harassment" by Dee Hodge, the Department head at the Wastewater Treatment Department.

### Issue:
The primary focus of my investigation is to determine if there were any indicia of sexual harassment by Dee Hodge toward Lindsey Yeaman at the city of Burley Wastewater Treatment Department.

In summary the investigation supports findings that:  There is no evidence of quid pro quo sexual harassment by Dee Hodge directed to Lindsey Yeaman.  That the actions of Dee Hodge, directed to Lindsey Yeaman, in the occasions as discussed hereinbelow, while inappropriate, are not frequent enough or severe enough to create a hostile work environment.  And, that there is no evidence that any other worker was offended by any conduct of Dee Hodge constitution sexual harassment as defined in law and policy.

### Investigation and Analysis:
In conducting this investigation, I interviewed some of the Wastewater Treatment Department's employees. The employees interviewed were Dan Pherigo, Lindsey Yeaman, Chelsey Ferrin, Dustin Raney, and Dee Hodge.  I also interviewed Carol Anderson, HR Director regarding the report made by Dan Pherigo on February 3, 2020.

PRIVILEGED AND CONFIDENTIAL

It should be noted for purposes of this investigation, and to meet the urgency of the City needing to have the investigation completed by Monday, February 10, 2020, that some factual disclosures came in late last week. Due to the short term of the investigation, there was no time to re-interview Dee Hodge about some of those allegations. However, based upon the earlier interview of Dee Hodge, and understanding his denial of any conduct or action that might constitute sexual harassment, the report will go forward, construing the facts most likely constituting sexual harassment for purposes of analysis under relevant law.

In general terms, the US Equal Employment Opportunity Commission (hereinafter "EEOC") states that harassment is a form of employment discrimination that violates Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, and the Americans with Disabilities Act of 1990.

Harassment is unwelcome conduct that is based on race, color, religion, sex (including pregnancy), national origin, age (40 or older), disability or genetic information. Harassment becomes unlawful where:

1) enduring the offensive conduct becomes a condition of continued employment, or
2) The conduct is severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive.

Petty slights, annoyances, and isolated incidents (unless extremely serious) will not rise to the level of illegality. To be unlawful, the conduct must create a work environment that would be intimidating, hostile, or offensive to reasonable people.

Offensive conduct may include, but is not limited to, offensive jokes, slurs, epithets or name-calling, physical assaults or threats, intimidation, ridicule or mockery, insults or put downs, offensive objects or pictures, and interference with work performance.

This investigation focuses on the allegation that conduct constituting sexual harassment may have taken place. Such harassment would constitute sexual harassment which is a type of employment discrimination consisting of unwanted sexual advances, sexual conduct, or other verbal or physical actions of a sexual nature, usually at the workplace. There are many different types of behavior that may constitute sexual-harassment including, but not limited to, the following:

PRIVILEGED AND CONFIDENTIAL

- Deliberate touching or repeated brushing against another's body, which does not contribute to or events to work, service or education being conducted;
- Repeated requests for a date, pressure or demands for a date, or for sexual activity with a subordinate by a person in an authoritative position or coworker;
- Displays through pictures or other forms of obscenity which do not contribute to the work, service, or education being conducted; and
- Any type of communication of a sexual nature that does not contribute to or advance the work being conducted.

The victim of sexual harassment does not need to be the intended recipient. In addition, a harasser can be a supervisor, coworker, contractor, or even customer or client. The harasser can be male or female, including the same gender as the victim.

There are to different types of sexual harassment that are legally recognized, they are:

1. quid pro quo sexual harassment; and
2. Hostile environment sexual harassment.

Quid pro quo sexual harassment occurs when an employee gets a promotion or gets to keep his or her position of the company based on whether the employee excepted sexual advances by another employee, typically a higher-ranking employee. If the employee rejects the advances, most situations provide that the employee does not get the promotion or may lose his or her job.

Hostile environment sexual harassment exists where a coworker or supervisor in the workplace makes sexual advances or comments to an employee that, while not affecting promotions or is the future of the Employees job, makes the workplace environment hostile and offensive, thus essentially unworkable.

The EEOC has determined that it is unlawful to harass a person because of that person's sex. Harassment can include sexual harassment or unwelcome sexual advances, requests for sexual favors, and other verbal or physical harassment of a sexual nature.

Harassment does not have to be of a sexual nature, however, and can include offensive remarks about a person sex. For example, it is illegal to harass a woman by making offensive comments about women in general.

PRIVILEGED AND CONFIDENTIAL

Although the law doesn't prohibit simple teasing, offhand comments, or isolated incidents that are not very serious, harassment is illegal when it is so frequent or severe that it creates a hostile or offensive work environment or when it results in an adverse employment decision such as the victim being fired or demoted.

Additionally, the City of Burley has a Discrimination and Harassment Policy, "Attachment B" to the City's Personnel Rules and Regulations, Adopted November 7, 2018.

In relevant part, the City's policy is that: "The City of Burley is committed to a work environment in which all individuals are treated with respect and dignity. Each individual has the right to work in a professional atmosphere that promotes equal employment opportunities and prohibits unlawful discriminatory practices, including harassment. Therefore, the City of Burley expects that all relationships among persons in the City workforce will be business-like and free of bias, prejudice and harassment." [page 68]

Further the City's policy is that: "It is the policy of the City of Burley to ensure equal employment opportunity without discrimination or harassment on the basis of race, color, religion, sex, sexual orientation, gender identity or expression, age, disability, marital status, citizenship, genetic information or any other characteristic protected by law. The City of Burley prohibits any such discrimination or harassment." [page 68]

Also, the City's policy states: "Sexual harassment does not refer to behavior or occasional compliments of a socially acceptable nature. It refers to behavior that is unwelcome, that is personally offensive, that lowers morale and therefore interferes with work effectiveness." [page 69]

In investigating allegations of sexual harassment, the EEOC looks at the whole record: the circumstances, such as the nature of the sexual advances, and the context in which the alleged incidents occurred. A determination on the allegations is made from the facts on a case-by-case basis. That is the standard that needs to be applied to the facts developed by this investigation.

In the interviews conducted, there were no reported observations of any incidents of touching, requests for a date or sexual activity, displays of pictures or items that were considered obscene, or any type of communication of a sexual nature, except for several items reported by Lindsey Yeaman.

PRIVILEGED AND CONFIDENTIAL

During the course of the investigation, Lindsey Yeaman disclosed the following:

1. Back at the time when she worked as a Lab tech, a time over two years ago, she had brought into the office an oversized pen and pencil that she had won at some event the prior weekend. Dee Hodge, her supervisor, came into her lab, picked up the pen and made a statement to the effect "Wow, this looks like a big old dildo", then put the pen back on her desk.

2. About two years ago, when Miss Yeaman changed jobs from being a lab technician to being the pre-treatment coordinator, Dee Hodge came up behind her work chair, where she was sitting, and put his hands on her shoulders. She felt uncomfortable with this gesture.

3. Soon after that incident of number 2 above, and on the day that Miss Yeaman left for training in North Carolina, Dee Hodge offered the following invitation to her " come go for a ride with me Lindsey-Bob". She understood this to mean for her to go with him in his truck. She declined the invitation as she was uncomfortable with it. On the same day as the invitation to go for a ride in the truck, Dee Hodge also asked her to look at him and then told her that the training was important, and that her job was on the line.

4. Within a month or two, then continuing over a period of time, Dee Hodge would comment to Lindsey that her job was on the line. She reports that he made this statement about her job being on the line four or five times.

5. On another occasion, sometime in about the past year, Dee Hodge brought a coffee mug into the office that had written on it, along with a drawing of a fisherman, "so good with my rod I make fish come." Miss Yeaman reports that he waved the mug in front of her face one or two times.

The investigation also brought forward that Dee Hodge can be stern, demeaning, even condescending in his managerial approach to employees. That being said, it was observed by some of the interviewed employees that Dee Hodge was consistent in treating all employees in such manner. The Wastewater Department has two female employees, Lindsey Yeaman and Chelsey Ferrin. Even though other employees mentioned Dee Hodge's demeaning approach in interpersonal interactions, Chelsey Ferrin indicated that she got along with Dee Hodge and had no real problems with his managerial style.

## PRIVILEGED AND CONFIDENTIAL

### Conclusion:

Typically, harassment of any type is viewed by how it is perceived by the person on the receiving end of the conduct, actions or statements, not by how it was intended by the person offering the conduct, actions or statements. Looking at the whole record, the circumstances, and the context in which the alleged incidents occurred as reported above, the investigation concludes, with respect to the five items reported by Lindsey Yeaman as follows:

1.    With regard to the oversized pen and the comment of Dee Hodge, to the effect that: "Wow, this looks like a big old dildo", certainly constitutes offensive conduct. Please note that this factual disclosure came into the investigation after the interview with Dee Hodges, so he has not been questioned about this alleged comment.

2.    With regard to the actions of Dee Hodge coming up behind Lindsey Yeaman, as she sat in her work chair, and putting his hands on her shoulders, making her feel uncomfortable, this is a deliberate, unwanted touching that does not contribute to, nor does it advance the work being conducted in the department. Dee Hodge asserted that he did not make any action that would constitute sexual harassment.

3.    With regard to the invitation of Dee Hodge to Lindsey Yeaman to "come go for a ride with me Lindsey-Bob". While this made her feel uncomfortable, and may have used a seemingly "too familiar" nickname, there is no indicia that this was an invitation of an inappropriate nature.  This information also was disclosed later in the investigation, and so Dee Hodge has not been questioned in relation to this alleged comment.

4.    With regard to Dee Hodge's statements that Lindsey's job was on the line, the context that these statements were reported within involved training and work related items that needed to be done. This has all the indicia of being appropriate based managerial oversight. Dee Hodge did agree that he made these types of statements. He did so in regard to managing Lindsey Yeaman over the past year or so, in trying to get her to perform the job requirements for the Pretreatment Coordinator position that she held.

5.    With regard to the occasion, within the past year when Dee Hodge brought a coffee mug into the office that had written on it, along with a drawing of a fisherman, "so good with my rod I make fish come." This is clearly an incident of inappropriate sexual innuendo. Even though there is disagreement about whether or not Dee Hodge

PRIVILEGED AND CONFIDENTIAL

waved it in Lindsey Yeaman's face. Dee Hodge admitted to bringing the coffee mug into the workplace, but denies waving it in Lindsey Yeaman's face.

Looking at the totality of the circumstances presented, there are at least three possible occasions of sexual related statements, conduct or innuendo that took place between Dee Hodge, the supervisor, and Lindsey Yeaman, a subordinate employee. Dee Hodge states there was never any sexual harassment, yet, Lindsey Yeaman states that all of these incidents made her feel uncomfortable. These incidents occurred over the course of more than two (2) years. So, even if all of these described incidents had occurred, this would seem to not be so frequent or severe to create a work environment that a reasonable person would consider to be intimidating, hostile, or abusive.

The issues with the work environment that come through the investigation as being most burdensome is that Lindsey Yeaman felt that she was being picked on. She was told that she could not wear ball caps when conducting Pretreatment Coordinator duties, even though the cap was City-issued, with a City logo on it. She was advised that she was not properly wearing a city issued shirt, (a button up style shirt) and that she had to button it up. Lindsey Yeaman described wearing that shirt over the top of a tank top, and did not have it all of the way buttoned up, so as to show the tank top underneath. She reports being directed to button it up further. Dee Hodge affirmed directing her to button it up, in order that she project a more professional appearance.

In follow up, the managerial intent was that the Pretreatment Coordinator is a very publicly visible worker that visits many businesses in the course of performing work, and as such needed to represent the City in a professional manner. It appears that although this was the Department goal, Lindsey Yeaman was not well trained or advised on the professional appearance aspect, based upon information that was available to the investigation.

Some of Lindsey Yeaman's co-workers thought she was picked on as well. Some based this on the dress standards for Lindsey Yeaman that were different from other workers in the department. Some was based upon Dee Hodge's treatment of her with respect to her performing work. One co-worker, Dustin Raney offered that Dee Hodge seemed to be a little harder on Lindsey Yeaman. But, with Lindsey on administrative leave from work, the Pretreatment Coordinator duties fell to Dustin Raney to perform. He advised that this work was way behind, with a big report due by March 1, 2020. Dustin Raney advised that he better understands now why Dee Hodge was "riding" Lindsey Yeaman as hard as he was to get the work done.

Page **7** of **9**

PRIVILEGED AND CONFIDENTIAL

Therefore,

1.      There is no evidence of quid pro quo sexual harassment by Dee Hodge directed to Lindsey Yeaman.

2.      The actions of Dee Hodge, directed to Lindsey Yeaman, in the occasions set forth hereinabove, while inappropriate, are not frequent enough or severe enough to create a hostile work environment.

3.      There is no evidence that any other worker was offended by any conduct of Dee Hodge, where such conduct would constitute sexual harassment as defined in law and policy.  There were no reports of any one observing any inappropriate touching, or inappropriate requests or demands, or inappropriate displays of pictures or other objects, or any type of communication of a sexual nature that does not contribute to or advance the work being conducted at the City of Burley Wastewater Treatment Department.

Respectfully Submitted:

Kerry D. McMurray
Attorney-at-Law

PRIVILEGED AND CONFIDENTIAL

**Addendum to Investigation:**

During the course of the investigation, other items came forward that may be of concern to the City. I did not follow up on these items, but report them as an addendum for the City's consideration and review. Such is set out hereinbelow:

Additionally, the investigation notes for information purposes only, some additional areas of concern, that may reflect potential gender based bias in the Wastewater Department.

It was reported, primarily by Chelsey Ferrin, during the investigation, that there seems to be different rules of conduct for male and female workers in the department. The differences are of the following nature:

- Requests for leave, particularly sick leave, are usually accepted without much explanation for male workers, whereas the female workers report that they will have to make more detailed statement of the nature of why they need to use sick leave, including intimate details that make them uncomfortable.
- When there are departmental celebrations, i.e., birthdays, a female worker was told to cut the cake and serve it, as well as to wash the dishes, etc., feeling that such requests were made because she was a female, not a male employee. The female declined to perform such "chores" and did not feel any retribution or adverse employment impact from the declination.

The investigation further indicates some areas of concern regarding Dan Pherigo. The following was reported in relation to Dan Pherigo:

- On January 31, 2020, Dan Pherigo had an encounter with a sales representative, during which Dan used the "N" word and referred to Mormon cultism. This made co-employee Dustin Raney uncomfortable, and he believed that it also made the sales rep uncomfortable.
- Dan Pherigo reported that he advised some of the other department employees to "stay out of it" meaning issues regarding Lindsey Yeaman's employment and the proposed action to terminate her. Dan Pherigo reported this to the investigator, explaining that he did not want others to jeopardize their employment status with the City. Dee Hodge heard about Dan Pherigo's statement from other employees, and discussed concern that it meant that Dan Pherigo would take harmful, maybe even violent action in the workplace and maybe toward Dee Hodge.

Page 9 of 9

# EXHIBIT N

**DECLARATION OF COUNSEL KELLY ANDERSEN, IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT [DKT.20] – EXHIBIT N**

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| OTTIS D. PHERIGO, an | ) |
|---|---|
| individual, | ) Case No. 4:21-cv-364 |
| Plaintiff, | ) |
| vs. | ) |
| CITY OF BURLEY, an Idaho | ) |
| municipal corporation, | ) |
| Defendant. | ) |
| _____ | ) |

DEPOSITION OF OTTIS "DANIEL" PHERIGO

TAKEN JUNE 9, 2022

REPORTED BY:

ANDREA L. CHECK, CSR No. 748, RPR, CRR

Notary Public

-- he'd done it the same way every time.

And I immediately left his office.  And I did call him some names, coward, drunk, one other thing I forget.  And I went immediately to HR, to Carol's office, discussed the situation with her, outlined my responses, how I would get legal representation, and what happened to Lindsey I was not allowing to happen to myself.

And then I left there, went to my doctor's appointment, came back, I think, at noon.  And about 12:30 Mark Mitton shows up with the county sheriff's deputy and said I had made a threat to kill Dee Hodge.  And they escorted me off the property.

And all my possessions there, like keys, the only keys to my truck, my big pickup, all my tools, Allen-Bradley splicing kit, a very expensive piece of equipment, all -- everything.  And they made it plain if I came back on the property, I would be arrested for criminal trespass.  And as far as I know, that has never been rescinded.

Q.  Did you threaten to kill Dee Hodge?

A.  No, I did not.

Q.  What did you threaten to do?

A.  I didn't threaten anything.  When I went to make the sexual harassment claim at Dee Hodge, I talked

141

REPORTER'S CERTIFICATE

I, ANDREA L. CHECK, CSR No. 748, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony and all objections made were recorded stenographically by me and transcribed by me or under my direction;

That the foregoing is a true and correct record of all testimony given, to the best of my ability;

I further certify that I am not a relative or employee of any attorney or party, nor am I financially interested in the action.

IN WITNESS WHEREOF, I set my hand and seal this 17th day of June, 2022.

_____

ANDREA L. CHECK, CSR No. 748, RPR, CRR

Notary Public

P.O. Box 2636

Boise, Idaho 83701-2636

My Commission expires July 20, 2022.

# EXHIBIT O

**DECLARATION OF COUNSEL KELLY ANDERSEN, IN RESPONSE TO MOTION FOR
SUMMARY JUDGMENT [DKT.20] – EXHIBIT O**

March 5, 2020


Dan Pherigo Hearing Opportunity
Dan Pherigo
Lindsey Yeaman
Mark Mitton
Carol Anderson
9:00 AM
Mark Mitton Office

Dan walked in and said "I have nothing to say."  I asked him to wait a minute to start the recorder.

Mark said "You don't have anything to say."

Dan "I didn't do anything wrong."

Mark "You didn't say those things?"

Dan "I did not."  "I let everyone know that morning, what I was going to do, come to HR, bring Dee up on sexual harassment charges. That part's true."

"He had a nice two weeks to wipe everything up, that's fine.  I just want to know what my status is?"

Mark  "Well, you have been on administrative leave, that is pretty standard as we go through the process. I got to think about this.  Stay on administrative leave until I make a decision.  You can appeal my decision with the mayor, that is the process. And so that is your status, still on administrative leave, paid." "Do you have anything else to say?"

Dan "Other than I didn't do it.  The only thing I'm guilty of is trying to protect Lindsey."

Mark "Okay, alright well I won't take anymore of your time. "


BURLEY000011

Can I talk to your for just a minute Lindsey, with Carol? No, okay."

Dan and Lindsey got up and walked out.
9:33 AM.

BURLEY000012

# EXHIBIT P

Job Performance Evaluation

Employee: _Ottis Pheeigo_    Dept./Div.: _Wastewater_
Title: _Senior Maintenance Tech_    SS #: _____

Evaluation Type: (Check One)    Done By DHodge ~~AT~~

( Regular Annual )    3-Month Progress    6-Month Progress    Special or Final

SECTION A: ALL EMPLOYEES: Choose the appropriate number for employee evaluation. Narrative comments are to be made on the comment lines. Suggestions for improvement and encouragement should be noted on the comment lines. Be sure to put a score in the space provided.

1 = Employee does not meet expectation. 2 = Employee minimally meets expectations.
3 = Employee meets expectations. 4 = Employee exceeds expectations.
5 = Employee is exceptional in this area.

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| **1 Self – Confidence** - Shows high degree of self-confidence resulting in good decisions. | 1 | 2 | ③ | 4 | 5 |
| **2 Job Knowledge** - Effectively uses broad & complete job experience/skills. | 1 | 2 | ③ | 4 | 5 |
| **3 Establish Priorities** - Consistently takes prompt action to meet schedules. | 1 | 2 | ③ | 4 | 5 |
| **4 Accuracy & Completeness** – Errors rarely found, outstanding detailed work. | 1 | 2 | ③ | 4 | 5 |
| **5 Work Habits** – Completes work, seeks new assignments, "self-starter." | 1 | ② | 3 | 4 | 5 |
| **6 Volume of Work** – Continually produces well above average. | 1 | 2 | ③ | 4 | 5 |
| **7 Initiative in Work Improvement** – Efforts to improve show positive results. | 1 | 2 | ③ | 4 | 5 |
| **8 Preparation of Written Materials** – Excellent quality -- complete, concise & accurate. | 1 | 2 | ③ | 4 | 5 |
| **9 Acceptance of Responsibility** – Accepts personal share of responsibility for department effectiveness, often without request. | 1 | 2 | ③ | 4 | 5 |
| **10 Supervision Required** - Dependable to act on own, with initiative & effectiveness. | 1 | 2 | ③ | 4 | 5 |
| **11 Job Attitude** – Excellent attitude that inspires/"lifts" others. | 1 | ② | 3 | 4 | 5 |
| **12 Acceptance of Supervision** – Follows directions to full intent without delay. | 1 | 2 | ③ | 4 | 5 |
| **13 Versatility in Variety of Situations** – Can handle almost any situation effectively. | 1 | 2 | ③ | 4 | 5 |
| **14 Understanding Instructions** - Grasps complex orders quickly & accurately. | 1 | 2 | ③ | 4 | 5 |
| **15 Problem Analysis & Decision Making** – Makes sound decisions considering all significant factors | 1 | 2 | 3 | ④ | 5 |
| **16 Operation & Maintenance of Equipment** – Maximum & proper maintenance of equipment. | 1 | 2 | ③ | 4 | 5 |
| **17 Safety** – Takes extra precautions to assure safety for others. | 1 | 2 | 3 | ④ | 5 |
| **18 Interaction with Co-workers** – Alert to offer assistance where it may assure a higher level of efficiency/build cohesion among co-workers. | 1 | 2 | ③ | 4 | 5 |
| **19 Public & Other Customer Assistance** – Friendly manner/searches for ways to say "you can do that, let me explain how." | 1 | 2 | ③ | 4 | 5 |
| **20 Attendance** – Outstanding work attendance/always available | ① | 2 | 3 | 4 | 5 |
| **21 Appearance** – Neat & properly groomed, always properly attired/"presentable", "business-like." | 1 | 2 | ③ | 4 | 5 |

Comments
_#4 Lots of incomplete Projects_
_#11 Lousy Work Attitude — Hates to Be Here_
_#15 Very good to consider all consequences when analyzing approach_
_#17 Very good to use lockouts and survey work area for issue_
Average= ____ . _#20 Absent from Health issues. No vacation or sick leave Accumulated._

BURLEY000098

Individual Job-related Goals for Next Review Period: (Developed by the person being evaluated) (Must provide minimum of 2.)

1.                                          3.

2.                                          4.

Individual Goals Achieved From Last Period: _____ out of _____

Supervisor Assigned Goals for Next Review Period: (Developed for the person being evaluated) (Must provide a minimum of 2)

1. _Work Hard to Be Healthy_  3. _Get uncompleted Projects_
_And get some Time Built up._  _Finished, ie. UV, Fitters,_
                                _Pumps, Ox Ditch_ ↑

2.                                          4.

Assigned Goals Achieved from Last Period: _____ out of _____

To be completed by the Individual being evaluated:

☒  I have discussed this report with my supervisor,

☐  I plan to submit a written exception in this evaluation, through my department head and for inclusion in Permanent personnel file, per City and /or departmental policy.

☐  I have received a copy of this evaluation.

Employee Signature: _Otis D Perigo_                    Date: _4/22/16_

Probationary Status (Completed by Supervisor/Evaluator):

☐  Not Applicable for this Evaluation Type          ☐  Recommend that Permanent Status Be Granted
☐  Recommend Rejection during Probationary Period    ☐  Extend Probationary Period (per applicable MOU

This Report is based upon my observation and/or knowledge. It represents my best judgment of the employee's performance.

Rated By: _____                                      Date: _____

Reviewed with Employee By: _____              Date: _4.22.16_

Department Head Signature: _____              Date: _4.22.16_

Department Head Comments:          ☒  I concur with this evaluation
(Choose one, attach narrative if any)  ☐  I concur with this evaluation with noted exceptions (attached)

_Change Status ·  6 months Probation_

_27 32 - 38    # 22 co_

_OK-MW 4/22/2016_

BURLEY000099

# EXHIBIT Q

2-18-20        11:00 am

Beginning since the time Lindsey's
Letter of Proposed Termination, I have
had several instances employees:
Dustin, Rusty, Stormy, said that
Dan had threatened them All.
Claims that Dan warned them if they
see anything happenes, to stay out of
it because he doesn't need anyone
else hurt.

Our Department is on edge That he
will return to work and either do
some physical violence or shoot
everyone there.

Lee Hodge

BURLEY000058

# EXHIBIT R

**DECLARATION OF COUNSEL KELLY ANDERSEN, IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT [DKT.20] – EXHIBIT R**

on monday morning Fed 3 rd
I went in to the control Room to Look at
the scoda 7:45 Am Don came in set
down upset and said Dee hurt someone
he cared adout and he wont me to stay
out of what ever was going to happen
and to till glen stay out it Becase he
didnt wont us her t!

FeB 14 th

BURLEY000060